[No. D043104. Fourth Dist., Div. One. May 26, 2005.]

ESCONDIDO UNION SCHOOL DISTRICT, Plaintiff and Appellant, v. CASA SUEÑOS DE ORO, INC., Defendant and Appellant.

946

950

## COUNSEL

Best Best & Krieger, Bruce W. Beach, Karen Freeman Landers and Adria Allen for Plaintiff and Appellant.

Mahaffey & Associates, Douglas L. Mahaffey and Sean T. McGee for Defendant and Appellant.

## Opinion

**IRION, J.**—These appeals from a $495,850 eminent domain judgment involve two parcels, each containing a manufactured home, owned by Casa Sueños De Oro, Inc. (Casa Sueños) and condemned by the Escondido Union School District (District) for construction of an elementary school.

District appeals, contending the judgment must be reversed because Casa Sueños was erroneously awarded compensation for the manufactured homes. In this regard, District attacks the trial court's findings that (1) Health and Safety Code section 18551 was inapplicable to this condemnation proceeding and (2) the manufactured homes were improvements pertaining to the realty under Code of Civil Procedure sections 1263.205 and 1263.210.[1] District also contends the court erred in admitting the testimony of Casa Sueños's real estate appraiser, contending his valuation was incorrect on various grounds and his statement of valuation data was not timely exchanged under the pertinent discovery statutes.

Casa Sueños also appeals, contending the court abused its discretion by denying litigation expenses.

### PROCEDURAL AND FACTUAL BACKGROUND

In 1999, Casa Sueños purchased a half-acre parcel on Fig Street in Escondido with the intention of dividing it into two lots and placing a manufactured home on each lot for resale. A manufactured home is a prefabricated structure designed for residential occupancy and built on a permanent chassis that is transported to a building site for assembly and installation.

In March 2000, District notified Casa Sueños that its Fig Street property would be needed for the construction of an elementary school and offered to purchase it. Casa Sueños rejected District's initial purchase offers for the unimproved land.

By April 2000, Casa Sueños had obtained final approval to build its two-lot subdivision from the City of Escondido.

For about a year, Casa Sueños did not develop the property, adopting a "hold pattern" as District attempted to obtain state funding to purchase the land for the proposed school. In May 2001, Casa Sueños learned that District had dropped plans to purchase the property because its funding sources had dried up.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

In mid-July 2001, Casa Sueños started to grade the property and also ordered the two manufactured homes it planned to assemble and install on the property. Through the summer and early fall, Casa Sueños continued to prepare the property for delivery of the manufactured homes. After the lots were graded, the contractor prepared the land for wood building pads by digging an approximate three-foot-deep area on each lot to match the footprint of the particular manufactured home to be placed on the lot. Next, one-foot-wide, 18-inch-deep trenches were dug around the perimeters of the building pads, steel rebar was placed in the trenches, and the trenches were filled with concrete; these became the reinforced concrete footings for the manufactured homes.

Casa Sueños also began marketing the lots by advertising in local newspapers, distributing flyers and placing a sign on the property. The lot with the smaller manufactured home was sold on July 28; the lot with the larger manufactured home was sold on August 1.[2]

Meanwhile, District revived its plans to obtain the property and build an elementary school on it. On October 5, District offered to purchase the property from Casa Sueños pursuant to Government Code section 7267.2, subdivision (a). Casa Sueños did not accept the offer. On October 31, District sent Casa Sueños a notice of intent to adopt a resolution of necessity.

On November 9, the first of the two manufactured homes (the larger one) was delivered to the site. It arrived in three sections that were loaded on the semitrailer of a large truck. The trailer was maneuvered over the wood building pad and perimeter footings and parked. Next the truck was unhooked, the plastic protecting the three sections was stripped off, and the sections were raised to remove the axles and hitches. The sections were then lagged together and lowered onto the foundation piers, which stood approximately 12 inches off the ground. When the three sections were in place on the piers and pad, the home was bolted together. The roof was bolted together to make the structure weathertight at the roof line.

Then the crew started bolting the 12-inch-tall piers directly to the metal frame on the bottom of the structure. The bottoms of the piers were connected to the pad resting on the concrete footings. Casa Sueños maintained this manufactured home was completely attached to the pier-and-pad foundation system and permanently in place, standing approximately one foot off the ground by the end of the workday on November 10.

---

[2] One house was advertised as an 1,800-square-foot building and sold for $260,524. The other house, which was advertised as a 1,600-square-foot building, sold for $240,624. Casa Sueños committed itself to having the manufactured home on each lot ready for the purchasers to occupy no later than December 15.

The crew began constructing a concrete block retaining wall around the perimeter of the structure to prevent dirt from getting underneath during the subsequent backfilling of the lot. After the retaining wall was completed on November 14, there was a gap of three or four inches between the wall and the bottom of the manufactured home in which a mudsill was to be installed. A mudsill is a buffer between the block wall and the manufactured home that prevents debris from getting under the structure.

District adopted its resolution of necessity on November 15, declaring that acquisition of the property by eminent domain was necessary for the construction of the elementary school and authorizing eminent domain proceedings to acquire the property. On November 16, District filed its complaint in eminent domain. Casa Sueños was served with the complaint on November 19.

The second manufactured home had been delivered to the site in two sections on November 16. The crew began installing the structure and attaching it to the pier and foundation system. Casa Sueños maintained this structure was permanently affixed to the foundation on November 17. On November 19, the crew started building the perimeter block wall for this manufactured home, but work on the wall stopped in the afternoon after Casa Sueños was served with District's eminent domain complaint.[3]

On November 20, District deposited probable compensation of $110,000[4] with the San Diego County Treasurer in connection with its application for an order of possession under the "quick-take" statutory scheme of the Eminent Domain Law. (See §§ 1255.010 et seq., 1255.410.)

On December 21, District and Casa Sueños stipulated to District's possession of the parcel as of that date, with District assuming any risk of loss for the manufactured homes. The stipulation also established the date of value as December 11 and required District to add $10,000 to its deposit as probable compensation, raising the total to $120,000. The court subsequently issued an order for possession based on the terms of the stipulation.

On April 29, 2002, the parties entered another stipulation for transferring possession to Casa Sueños of the two yet-to-be-finished manufactured homes

---

[3] Thus, on November 19, the date of condition for eminent domain purposes, Casa Sueños still had a good deal of work to do on the manufactured homes. At that point, neither lot had been backfilled. Nor had the garages, driveways, or steps to the manufactured homes been built. Work inside the houses, such as carpet installation, had not been accomplished. The utilities were not connected. A certificate of occupancy (see Health & Saf. Code, § 18551) had not been issued for either house.

[4] The amount of the deposit was based on the appraisal by the District's appraiser, who viewed the land as graded vacant land with a fair market value of $55,000 per lot or $110,000 total.

(see fn. 3, *ante*) in exchange for a $114,300 credit on the final judgment in the eminent domain lawsuit "in the event [of] an ultimate determination . . . that the manufactured homes are improvements pertaining to the realty."[5] The stipulation noted the parties' disagreement "as to whether the manufactured homes are to be taken into account in determining compensation" and provided the "parties reserved all . . . rights pertaining to . . . the amount of just compensation owed by the District to Casa Sueños." The stipulation also noted District's intention to proceed with the elementary school project and the necessity "to remove, relocate or demolish all existing structures." As part of the stipulation, District agreed to pay $48,800 to cover the costs of removing and relocating the manufactured homes to a different site.[6] Upon relocation, the stipulation provided that Casa Sueños assumed the risk of loss for the manufactured homes.

On July 12, District filed and served a demand for exchange of valuation data in compliance with section 1258.210. On November 18, District and Casa Sueños served their lists of expert witnesses and statements of valuation data. Casa Sueños's statement of valuation data dealt with only one of the two parcels and was based on an incorrect date of value.

On December 5, District took the deposition of John Betteker, Casa Sueños's appraisal expert, who revealed he had appraised only one of the two lots and had used the wrong date of value.

On December 17, the parties exchanged final offers and demands; Casa Sueños demanded $250,000, and District offered $180,000.[7] Although trial did not begin until May 12, 2003, the trial court twice refused to reopen discovery in the interim.

On April 7, 2003, Casa Sueños served District with a revised statement of valuation data for Betteker; the statement included appraisals for both lots based on the correct date of valuation. The court denied District's in limine motion to exclude or limit Betteker's testimony.

On May 5, District filed a revised final offer of $200,000.

---

[5] This was the price Casa Sueños paid the manufacturer for the two manufactured homes.

[6] A crew of 11 men worked five to six days to remove the two manufactured homes from the lots. They had to jackhammer the foundations away from the perimeters of the home to be able to get underneath the structures to unbolt the piers and pads and replace the axles and wheels. The crew also had to remove the roofing and unbolt the sections of the homes.

[7] Casa Sueños's demand of $250,000 was for "new money"; that is, it was demanding $250,000 in addition to the $120,000 that District had previously deposited. District maintained that it was not aware until a settlement conference on May 2, 2003, that Casa Sueños's final demand was for $250,000 in new money on top of the $120,000 District had previously deposited.

During the first phase of the trial, the court, sitting without a jury,[8] ruled the two manufactured homes were "improvements pertaining to the realty" and therefore compensable under eminent domain law. (§§ 1263.205, 1263.210.) Among other things, the court noted that the manufactured homes "were affixed to their foundations by use of their weight, anchor bolts, and piers and pads in such a manner that they would permanently be kept in place" and the "removal of the manufactured homes required a great amount of work and expense." The court further rejected District's argument that Health and Safety Code section 18551, relating to the installation of manufactured homes and mobilehomes as "a fixture or improvement to the real property" (*id.,* § 18551, subd. (a)), was applicable to condemnation proceedings.

In the second phase of trial to determine the amount of just compensation, the parties waived a jury trial. (See fn. 8, *ante.*) Casa Sueños presented evidence that the value of the two homes when completed would have been $530,000 and the cost to complete the subdivision from the date of condition (November 19) was $35,150. District, which had only appraised the property as improved land without the manufactured homes, elected not to present valuation evidence. The court awarded Casa Sueños $494,850 as just compensation for the taking ($530,000 - 35,150 = $494,850). Subsequently, the court denied Casa Sueños's application for litigation expenses.

## DISCUSSION

## I

## DISTRICT'S APPEAL

### A. *Overview of Eminent Domain Law*

The California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner . . . ." (Cal. Const., art. I, § 19; see also U.S. Const., Amends. V, XIV.) The just compensation clause "is primarily aimed at making a landowner whole for any governmental taking or damage to his or her property." (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 715 [66 Cal.Rptr.2d 630, 941 P.2d 809].)

---

[8] Under California law, the court determines all questions in eminent domain trials except the determination of compensation. (*People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799].) All other questions, including mixed questions of law and fact, are to be tried by the court, without reference to the jury. (*Ibid.*) The jury determines the amount of just compensation for the taking unless a jury is waived. (Cal. Const., art. I, § 19.)

■ Because just compensation is a constitutional requirement, it " 'cannot be made to depend upon state [or federal] statutory provisions.' " (*Redevelopment Agency v. Gilmore* (1985) 38 Cal.3d 790, 797 [214 Cal.Rptr. 904, 700 P.2d 794], quoting *Seaboard Air Line Ry. v. U. S.* (1923) 261 U.S. 299, 306 [67 L.Ed. 664, 43 S.Ct. 354].) " '[A]ll condemnation law, procedure and practice . . . is but a means to the constitutional end of just compensation to the involuntary seller, the property owner.' " (*People ex rel. Dept. of Transportation v. Southern Cal. Edison Co.* (2000) 22 Cal.4th 791, 800 [94 Cal.Rptr.2d 609, 996 P.2d 711].) Put another way, just compensation is the "overriding principle" that applies in eminent domain law. (*Mt. San Jacinto Community College Dist. v. Superior Court* (2004) 117 Cal.App.4th 98, 107–108 [11 Cal.Rptr.3d 465].)

However, the Constitution does not "contemplate[] that a person, whose land is taken in the exercise of the right of eminent domain, shall be entitled to anything beyond a 'just compensation.' He is to be paid the damage he actually suffers, and nothing more." (*Cal. P. R. Co. v. Armstrong* (1873) 46 Cal. 85, 90.) "[T]he landowner is to be 'put in as good position pecuniarily as he would have occupied if his property had not been taken.' [Citation.] 'He must be made whole but is not entitled to more.' " (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.*, *supra*, 16 Cal.4th at p. 704.) After all, "[t]o award him less would be unjust to him; to award him more would be unjust to the public." (*Bauman v. Ross* (1897) 167 U.S. 548, 574 [42 L.Ed. 270, 17 S.Ct. 966].) "Stated another way, compensation for taking or damage to property must be just to the public as well as to the landowner. (*United States v. Commodities Trading Corp.* (1950) 339 U.S. 121, 123 [94 L.Ed. 707, 70 S.Ct. 547, 115 Ct.Cl. 842].)" (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.*, *supra*, at p. 716.)

■ In California, eminent domain proceedings are governed by a comprehensive statutory scheme, known as the Eminent Domain Law. (§ 1230.010 et seq.) The Legislature adopted the Eminent Domain Law in 1975, to become effective July 1, 1976, as part of a comprehensive recodification of condemnation law proposed by the California Law Revision Commission. (Stats. 1975, ch. 1275, § 2, pp. 3409–3465; see also 13 Cal. Law Revision Com. Rep. (1975) pp. 1007, 1009–1012.) Pursuant to legislative direction, the Law Revision Commission studied existing eminent domain law in California and reviewed similar laws of every jurisdiction in the United States. (See 13 Cal. Law Revision Com. Rep., *supra*, pp. 1009–1011.) The new Eminent Domain Law was intended "to cover, in a comprehensive manner, all aspects of condemnation law and procedure" and to produce "a modern Eminent Domain Law within the existing California statutory framework." (*Id.*, pp. 1010–1011.)

Under the Eminent Domain Law, in a standard condemnation proceeding the public agency does not take possession and title until after judgment and full payment has been made; thus, the "taking" and the "compensation" are contemporaneous.[9] Until then, the property owner bears the risk of loss to the property. (*Redevelopment Agency v. Maxwell* (1961) 193 Cal.App.2d 414, 417–418 [14 Cal.Rptr. 170].)

However, the Eminent Domain Law also provides for a procedure that allows a public agency to take early possession of the condemned property; here, District invoked these quick-take provisions by depositing with the court the probable compensation as determined by appraisal (§ 1255.010) and obtaining an order for possession (§ 1255.410).[10] (See *Redevelopment Agency v. Gilmore, supra,* 38 Cal.3d at p. 800.) ▇ While the valuation date in standard condemnation proceedings "is either the date of commencement of proceedings, or of commencement of trial (§§ 1263.120, 1263.130), a different rule applies in quick-take situations. There, the land is to be valued as of the date of the deposit of estimated value which permits an order for early possession. (§ 1263.110.) . . . [¶] These sections give effect to the fact that, except for defenses to the exercise of eminent domain, a landowner in California is permanently deprived of all of his rights in property sought by a public agency when the agency exercises its option to deposit estimated value and obtain early possession for the intended public use." (*Id.* at pp. 800–801.) It follows in such situations that the risk of loss to the property shifts from the landowner to the public agency when the agency takes possession. (*Redevelopment Agency v. Maynard* (1966) 244 Cal.App.2d 260, 265 [53 Cal.Rptr. 42] [condemnee bears risk of destruction of a material part of the property until condemner takes either title or possession].)

---

[9] Title to the property vests in the condemning party upon the date of recordation of a final order of condemnation in the county recorder's office. (§ 1268.030.)

[10] Section 1255.410 provides:

"(a) At the time of filing the complaint or at any time after filing the complaint and prior to entry of judgment, the plaintiff may apply ex parte to the court for an order for possession under this article, and the court shall make an order authorizing the plaintiff to take possession of the property if the plaintiff is entitled to take the property by eminent domain and has deposited pursuant to Article 1 (commencing with Section 1255.010) an amount that satisfies the requirements of that article.

"(b) The order for possession shall describe the property of which the plaintiff is authorized to take possession, which description may be by reference to the complaint, and shall state the date after which the plaintiff is authorized to take possession of the property.

"(c) Notwithstanding the time limits for notice prescribed by Section 1255.450, if the court finds that the plaintiff has an urgent need for possession of property and that possession will not displace or unreasonably affect any person in actual and lawful possession of the property to be taken or the larger parcel of which it is a part, the court may make an order for possession of such property upon such notice, not less than three days, as the court deems appropriate under the circumstances of the case."

■ By statute, the measure of compensation for property taken pursuant to the government's powers of eminent domain is its "fair market value." (§ 1263.310.) "[F]air market value" is defined as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).)

### B. *Inclusion of Manufactured Homes in Just Compensation Award*

District contends the trial court erred in finding the two manufactured homes were "improvements pertaining to the realty" and including them in the just compensation award. (§§ 1263.205, 1263.210.)[11]

### 1. *The Court Correctly Classified Manufactured Homes as "Improvements Pertaining to the Realty" Under Eminent Domain Law*

As we shall explain, we find the trial court correctly found the manufactured homes were "improvements pertaining to the realty" (§ 1263.210, subd. (a)) and properly took them into account in determining just compensation under the pertinent compensation provisions of the Eminent Domain Law.

■ The owner of property acquired by eminent domain is entitled to compensation in accordance with the provisions of the Eminent Domain Law. (§ 1263.010.) The law seeks to place the property owner in as good a position monetarily as if the property had not been taken. (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 925 [62 Cal.Rptr.2d 121].) The general rule is that the owner receives the "market value of the land, together with the improvements thereon, viewed as a whole and not separately." (*City of Los Angeles v. Klinker* (1933) 219 Cal. 198, 211 [25 P.2d 826].) Thus, when the government condemns private land, it in effect appropriates the realty as improved. (See § 1263.210, subd. (a).) In essence, this case boils down to a classification issue—whether the manufactured homes were properly classified as "improvements pertaining to the realty"— because resolution of that issue determines valuation and compensation.

---

[11] The more pertinent of these statutes, section 1263.210, subdivision (a) reads: "Except as otherwise provided by statute, all improvements pertaining to the realty shall be taken into account in determining compensation."

The phrase "improvements pertaining to the realty" has been the operative term of art in California condemnation law at least as far back as 1872, when the Code of Civil Procedure, including the state's first eminent domain statutes, was enacted.[12] Nonetheless, condemnation case law has borrowed heavily from the law of fixtures, including its attendant tests for determining whether an item placed on land "is a 'fixture' so integrated into the fee as to become real property, [that is,] a compensable fixture, or whether the item is mere personalty." (8A Nichols on Eminent Domain (3d ed. 1982) § 28.01[1], p. 28-3.) Thus, to a certain extent, the terms "improvements" and "fixtures" have been used almost interchangeably.[13]

■ California condemnation law, in keeping with most jurisdictions, has long incorporated an expansive view toward improvements to realty and compensable fixtures. (See, e.g., *City of Los Angeles v. Klinker, supra,* 219 Cal. 198; see also 8A Nichols on Eminent Domain, *supra,* § 28.06.) An appropriation of land by the government " 'is an appropriation of all that is annexed to the land whether classified as buildings or as fixtures.' " (*People v. Klopstock* (1944) 24 Cal.2d 897, 903 [151 P.2d 641]; see also 8A Nichols on Eminent Domain, *supra,* § 28.06.) Although under modern jurisprudence, it is taken for granted that buildings are "improvements pertaining to the realty" and therefore compensable, this was not always the case. In an

---

[12] The predecessors to section 1263.210 are former sections 1248, subdivision (1), and 1249.1. (13 Cal. Law Revision Com. Rep., *supra,* p. 1206.) Former section 1248, subdivision (1), enacted in 1872, provided the trier of fact shall "ascertain and assess: [¶] 1. The value of the property sought to be condemned, and all *improvements thereon pertaining to the realty* . . . ." Former section 1249.1 read: "All *improvements pertaining to the realty* that are on the property at the time of the service of summons and which affect its value shall be considered in the assessment of compensation . . . ." (Stats. 1961, ch. 1613, § 6, p. 3446, italics added.)

[13] As noted by the court in *People v. Church* (1943) 57 Cal.App.2d Supp. 1032, 1041–1042 [136 P.2d 139]:

"[A] great deal of confusion in considering when it is that what was personal property has become a part of the land has been introduced by the different senses in which the decisions use the word 'fixture.' According to the more common and probably the better usage, a 'fixture' is by definition a part of the realty. The word has, however, also a secondary meaning. In Webster's New International Dictionary we find 'fixture' as used in the law, defined as follows:

" 'Law. Anything of an accessory character annexed to houses and lands, so as to legally constitute a part thereof;—often called an *immovable fixture.* The law on the subject of *fixtures* varies with different subjects and in different jurisdictions. In general, however, a chattel will become a *fixture* if it is annexed in a manner relatively permanent and is of such a nature as to be suitable for use as part of the land to which it is annexed. . . .

" 'Law. Less commonly, a personal chattel annexed to lands or tenements but removable by the person annexing them, or his personal representative, without the consent of the owner of the real estate;—often called a movable fixture.'

"It is probably fair to say that of these two definitions the former is not only the one preferred by lexicographers, but it is the one sanctioned by the great weight of authority, both without this state and within it."

1891 case, our Supreme Court found that houses that were " 'built on redwood mudsills of two-inch by six-inch timber, said mudsills resting upon the soil, [which] was not disturbed in building or removing said houses,' " were not fixtures attached to the land. (*Miller v. Waddingham* (1891) 91 Cal. 377, 379 [27 P. 750].) "Whether, in any case, buildings that are placed upon land become fixtures, is a question of fact to be determined upon the evidence of that particular case. The mere erection of a building upon land does not necessarily make it a fixture [citation]; and in order to determine whether it be a fixture depends upon various circumstances and relations connected with its being placed upon the land." (*Ibid.*) Subsequently, the focus of the case law during the 20th century switched from buildings to trade fixtures—that is, items placed on the property for business and/or manufacturing purposes. (See, e.g., *City of Los Angeles v. Klinker, supra,* at p. 205.)[14]

Throughout, the common law's traditional three-prong test for fixtures—intention, annexation and adaptability—generally has been used. As this court once put it: " '[T]he intent of the parties is a controlling criterion in ascertaining whether property is permanently attached to the land or retains its identity as personalty; the character of the annexation to the land or other realty and the use made of the property are important considerations, but in most cases are subsidiarily employed for the purpose of testing the intention of the parties.' [Citations.] [¶] Among the things that should be taken into consideration in deciding such a question are the following: The character of the building and the manner of its construction; the presence or absence of customary methods of attaching to or embedding in the soil; the use to which the building is adapted and to which it has been put; and any expressed intent with regard to its permanence." (*Alderman v. Baggett* (1933) 134 Cal.App. 501, 503–504 [25 P.2d 532].) For example, in the leading case of *City of Los Angeles v. Klinker, supra,* 219 Cal. 198, our Supreme Court endorsed this three-prong test (*id.* at p. 206) and held the huge presses of the Los Angeles Times, for which special foundations had been built, and other heavy machinery, much of it bolted or grouted to floors and connected with the power, water and drainage systems, were fixtures for the purpose of an eminent domain award. (*Id.* at pp. 203–205, 209–210; see also *People v. Church, supra,* 57 Cal.App.2d Supp. 1032 [applying three-prong test to gas station]; Civ. Code, § 660.)

Some courts added another test, one based on economic issues, namely, the economic impact on the property owner. For example, in *Jackson v. State* (1914) 213 N.Y. 34 [106 N. E. 758], the state's highest court reversed a holding by a lower court that the condemner of a factory had a right to refuse

---

[14] The Legislature codifed this development in the law by enacting former section 1248b. (Stats. 1957, ch. 1098, § 1, p. 2404.) Former section 1248b was the predecessor to section 1263.205.

to pay for the equipment of the factory. In an opinion written by Judge Cardozo, the New York Court of Appeals said: "Condemnation is an enforced sale, and the State stands toward the owner as buyer toward seller. On that basis the rights and duties of each must be determined. It is intolerable that the State, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value. An appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures, and so it has frequently been held." (*Jackson, supra,* 106 N.E. at p. 758.)[15]

When a public agency acquires improved real property by eminent domain, "all improvements pertaining to the realty" must "be taken into account" (§ 1263.210, subd. (a)), including "machinery or equipment installed for use on property . . . that cannot be removed without a substantial economic loss or without substantial damage to the property on which it is" (§ 1263.205, subd. (a)). " 'Taken into account,' however, does not mean . . . that improvements must always be 'paid for by the condemnor.' [Citation.] Rather, under section 1263.210[, subdivision (a)], '[i]f the improvements serve to enhance the value of the property over its unimproved condition, the property receives the enhanced value; if the improvements serve to decrease the value of the property below its unimproved condition, the property suffers the decreased value.' " (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1110 [125 Cal.Rptr.2d 12]; see also 13 Cal. Law Revision Com. Rep., *supra,* p. 1206.)[16]

The parties argue extensively—and we think excessively—on whether the manufactured homes fall within the definition of "improvements pertaining to the realty" contained in section 1263.205, subdivision (a).[17] The problem with their arguments is they misconstrue the statute; the definition supplied

---

[15] California law also employs an economic loss test for compensation of fixtures in eminent domain cases. (See § 1263.205.)

[16] Unlike *Emeryville Redevelopment Agency v. Harcros Pigments, Inc., supra,* 101 Cal.App.4th 1083, this case does not involve improvements or fixtures that were incompatible with the highest and best use of the land, which was residential. By including a provision for a credit of $114,300 against the ultimate judgment if the manufactured homes were determined to be "improvements pertaining to the realty" in their April 29, 2002 stipulation, the parties implicitly acknowledged that the manufactured homes enhanced the value of the property.

[17] Section 1263.205, subdivision (a) reads: "As used in the article, 'improvements pertaining to the realty' include any machinery or equipment installed for use on property taken by eminent domain . . . that cannot be removed without a substantial economic loss or without

by the statute is not all-inclusive. (See 13 Cal. Law Revision Com. Rep., *supra*, p. 1205 ["it makes clear that certain facilities, machinery, and equipment are deemed improvements but does not affect buildings, structures and other fixtures which may also be improvements pertaining to the realty"].)[18] As one noted commentator has observed, section 1263.205 augments the obvious meaning of "improvements pertaining to the realty," which includes buildings, structures and fixtures, by including machinery or equipment installed on the property that cannot be removed without substantial economic loss or damage to the property. (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 1011, p. 572.)

In this case, which involves two nearly completed buildings, the better approach to determine proper classification of the manufactured homes is to consider whether they were annexed or affixed to the land on the day of condition—November 19, 2001, when Casa Sueños was served with summons.

■ Applying common law principles, we find they were. (See *City of Los Angeles v. Hughes* (1927) 202 Cal. 731, 736 [262 P. 737], overruled on another point in *County of Los Angeles County v. Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680].) At common law, property was considered either (1) real or immovable or (2) personal or movable. (Civ. Code, § 657.) Real property included land and things affixed to the land. (*Id.*, § 658.) "The law relating to fixtures recognizes that under certain circumstances personal property becomes a part and parcel of real property and thereafter assumes the status of real property." (*Bell v. Bank of Perris* (1942) 52 Cal.App.2d 66, 72 [125 P.2d 829].) Civil Code section 660 provides: "A thing is deemed to be affixed to the land when it is . . . permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws . . . ."

Whether the manufactured homes were permanently attached within the meaning of Civil Code section 660 is primarily a question of fact, which is reviewed under the substantial evidence test. (See *City of Commerce v. National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1, 18 [173 Cal.Rptr. 176]; *Southern California Gas Co. v. Goss* (1957) 149 Cal.App.2d 339, 341 [308 P.2d 41]; *Gosliner v. Briones* (1921) 187 Cal. 557, 559–560 [204 P. 19].)

---

substantial damage to the property on which it is installed, regardless of the method of installation."

[18] The Law Revision Commission pointed out that the previous statute (former § 1248b) applied only to equipment designed for manufacturing or industrial purposes. Section 1263.205 expanded the scope to include machinery as well as equipment and did not require these items be used for manufacturing or industrial purposes to fit within the definition. (13 Cal. Law Revision Com. Rep., *supra*, p. 1205.)

Although the parties presented conflicting evidence on how much work was completed by the date of condition, their respective witnesses agreed that the sections of the first delivered manufactured home, along with its roof, had been bolted together and the metal frame on the bottom of the structure was bolted to the pier-and-pad foundation system. Thus, at the very least, on November 19 this manufactured home was affixed to the land within the meaning of Civil Code section 660—it was permanently resting upon the land or permanently attached thereto by means of bolts.

As to the second delivered manufactured home, it presents a mixed question of law and fact because the parties presented conflicting evidence whether the contractor had finished bolting the structure to the pier-and-pad foundation. However, the court specifically found "the condition of the property on the operative date was as testified to by [Casa Sueños's witnesses]." As trier of fact, the court heard and viewed the evidence, including photographs submitted, and gave more weight to Casa Sueños's presentation. Substantial evidence supported the court's factual determination, and, as an appellate court, we do not reweigh the evidence. Thus, we find the court correctly determined that on November 19 the second delivered manufactured home, having been bolted to the pier-and-pad foundation system, also was affixed to the land, within the meaning of Civil Code section 660.

■ Along similar lines, the manufactured homes meet the traditional three-prong test to determine whether an article is to be considered a compensable fixture—that is, it is "so integrated into the [land] as to become real property." (8A Nichols on Eminent Domain, *supra*, § 28.01[1], p. 28-3.) The three-prong test considers: (1) the manner of annexation; (2) the adaptability of the article to the purpose for which the land is used; and (3) the party's intent to make a permanent annexation. (*City of Los Angeles v. Klinker*, *supra*, 219 Cal. at p. 206; see also 8A Nichols on Eminent Domain, *supra*, § 28.02[1], p. 28-3.) There is substantial evidence that Casa Sueños's manufactured homes met all three prongs. First, they were bolted to the pier-and-pad foundation system by the relevant date. Second, the lots had been developed for manufactured homes; indeed, the building pads were designed to match the footprints of these specific manufactured homes. Third, it was undisputed that Casa Sueños purchased the parcel with the intention of dividing it into two lots and placing a manufactured home on each lot for resale, and developed the land accordingly.

We conclude that on November 19, 2001, the manufactured homes were "improvements pertaining to the realty," and as such were properly taken into account in determining the compensation award. (§ 1263.210, subd. (a).)

## 2. *Statutory Exceptions for Postsummons Improvements and Removal of Improvements Do Not Apply in This Case*

Notwithstanding section 1263.210, subdivision (a), the Eminent Domain Law provides that an "improvement pertaining to the realty" is not subject to compensation in certain situations: if the improvement is removed or destroyed (§ 1263.230), or if it is a postsummons improvement (§ 1263.240). We consider these statutory exceptions seriatim in resolving whether either applies to prevent the manufactured homes from being taken into account in determining compensation.

### *Section 1263.230*

Section 1263.230, subdivision (a) provides that "[i]mprovements pertaining to the realty shall not be taken into account in determining compensation" if they are removed or destroyed before the condemner takes title or possession of the property, or before the date specified in an order for possession under the quick-take statutes. This provision establishes that the risk of loss shifts to the condemner when it takes title or possession.

Section 1263.230, subdivision (b) states: "Where improvements pertaining to the realty are removed or destroyed by the defendant *at any time*, such improvements shall not be taken into account in determining compensation. Where such removal or destruction damages the remaining property, such damage shall be taken into account in determining compensation to the extent it reduces the value of the remaining property." (Italics added.)[19]

District argues that because the manufactured homes were removed from the condemned land, they cannot be taken into account in determining compensation under section 1263.230, subdivision (b).

We disagree.

The evidence is clear that Casa Sueños did not unilaterally remove the manufactured homes from the condemned land. Rather, the manufactured homes were removed in accordance with the parties' arm's-length April 29, 2002 stipulation, which was presumably entered into in good faith by both parties. Casa Sueños received certain benefits from entering the stipulation as did District. District had assumed the risk of loss to the manufactured homes

---

[19] The Law Revision Commission noted: "Subdivision (b) makes clear that, where the defendant removes or destroys improvements even after the time the risk of loss shifts to the plaintiff, compensation is not awarded to the improvements." (13 Cal. Law Revision Com. Rep., *supra*, pp. 1207–1208.)

when it took early possession of the property through the quick-take provisions of the Eminent Domain Law. District, eager to proceed expeditiously with its school project, wanted the manufactured homes removed promptly. The only value of the manufactured homes to District was salvage value. But under the stipulation, District was able to (1) receive a $114,300 credit against the judgment for the manufactured homes in the event the court ruled adversely to it on the issue; (2) shift the risk of loss for the manufactured homes back to Casa Sueños; and (3) at the same time, accomplish its goal of having the manufactured homes removed. There was no evidence in the record that Casa Sueños was going to remove the manufactured homes absent the stipulation.

Section 1263.230, subdivision (b) does not preclude the condemner and condemnee from entering into a stipulation or contract. Under these circumstances, it is somewhat disingenuous for District to claim the stipulated removal of the manufactured homes should disqualify Casa Sueños from being compensated for "improvements pertaining to the realty" under section 1263.230, subdivision (b).

In our view, the question of whether section 1263.230, subdivision (b) applies in this case is appropriately reviewed under principles of estoppel. (See *Los Angeles County Flood Control Dist. v. Mindlin* (1980) 106 Cal.App.3d 698, 708–710 [165 Cal.Rptr. 233] [estoppel principles applied in condemnation action].) " '[I]t is settled that "[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it . . . ." [although] an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public . . . ." ' " (*Id.* at p. 709, quoting *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423].) The doctrine of equitable estoppel has four elements: (1) the party to be estopped was apprised of the true facts as to which the estoppel is claimed; (2) the party to be estopped intended that the other party act upon his or her conduct; (3) the party claiming the estoppel was ignorant of the true facts; and (4) the party claiming the estoppel suffered injury by relying upon the conduct of the party to be estopped. (*Ibid.*)

These elements were met by virtue of the April 29, 2002 stipulation, which provided for the removal of the manufactured houses. District, which instigated the stipulation, was aware of the true facts. District intended Casa Sueños to remove the manufactured homes pursuant to the terms of the stipulation. Casa Sueños was not aware that District planned to assert section 1263.230, subdivision (b) to prevent the manufactured homes from being "taken into account in determining compensation." Casa Sueños, which relied upon the reservation of rights provision of the stipulation, would suffer injury

if section 1263.230, subdivision (b) were applied. We conclude that principles of equitable estoppel preclude application of section 1263.230, subdivision (b) in this case.

Furthermore, a statute cannot defeat the constitutional requirement of just compensation. (*Redevelopment Agency v. Gilmore, supra*, 38 Cal.3d at p. 797.) Given the stipulation, application of section 1263.230, subdivision (b) in this case would contravene Casa Sueños's right to just compensation. Absent the stipulation, the manufactured homes would have remained on the property.[20]

*Section 1263.240*

Section 1263.240 provides that "[i]mprovements pertaining to the realty" made after service of summons shall not be taken into account in determining compensation in condemnation cases unless the improvements are made by a utility company, with the plaintiff's written consent, or are authorized by court order. (*Id.*, subds. (a)–(c).)

At trial, District maintained the manufactured homes should not be considered improvements meriting compensation because they had not been completely installed before Casa Sueños was served with the complaint and

---

[20] District also claims Casa Sueños is not entitled to compensation for the manufactured homes because the stipulation should be deemed as being entered into pursuant to section 1263.260, which reads in pertinent part: "Notwithstanding Section 1263.210, the owner of improvements pertaining to the realty may elect to remove any or all such improvements by serving on the plaintiff within 60 days after service of summons written notice of such election. If the plaintiff fails within 30 days thereafter to serve on the owner written notice of refusal to allow removal of such improvements, the owner may remove such improvements and shall be compensated for their reasonable removal and relocation cost not to exceed the market value of the improvements." District claims that because Casa Sueños received moving costs and the manufactured houses, it should not, under section 1263.260, also receive compensation for them. (See 13 Cal. Law Revision Com. Rep., *supra*, p. 1210.) We disagree. The removal of the manufactured homes pursuant to the parties' stipulation did not track the timeline of section 1263.260; the stipulation was entered into more than four months after service of the summons. Also, the stipulation did not mention section 1263.260. Further, from our reading of the stipulation, it is clear that Casa Sueños's motivation for entering the stipulation was *not* to convert the manufactured homes into personalty and receive the removal and relocation expenses. (See 13 Cal. Law Revision Com. Rep., *supra*, p. 1210 [statute was intended to provide a "means whereby the defendant may convert improvements pertaining to the realty to personalty and receive the moving cost for such personalty"].) The record is clear that Casa Sueños did not view the manufactured homes as personalty, did not intend to convert them into personalty and negotiated for a reservation of rights provision in the stipulation to preserve its rights to litigate whether the manufactured homes were "improvements pertaining to the realty" and therefore compensable. Moreover, as we have previously noted, Casa Sueños would not have moved the manufactured homes but for the stipulation, which provided substantial benefits to District.

summons, suggesting Casa Sueños did installation work after November 19, 2001. However, the trial court, after reviewing conflicting evidence, specifically found no further work was done on the manufactured homes after that date. Substantial evidence supports this finding and we will uphold it.

On appeal, District concedes Casa Sueños stopped work on the project after receipt of the summons and does not pursue the postsummons work argument. Rather, District presents a mitigation-of-damages argument. According to District, Casa Sueños had notice in October 2001 that District was going forth with its plans to condemn the property and should not have proceeded with assembling and installing the manufactured homes in November.

We disagree.

District would impose a cutoff date for work on a compensable improvement to the time the property owner gains knowledge of impending condemnation proceedings. But California law does not impose such a deadline; under section 1263.240, the cutoff date is the day the owner is served with the complaint and summons.

Further, the plans of a governmental agency to condemn land for a public use often are delayed or do not come to fruition. Therefore, requiring property owners to stop all work on a project as soon as they learn that a governmental agency may possibly condemn their land does not strike us as just or fair. Absent bad faith, such a restriction on a property owner's use of his or her land based on a mere possibility of government action would be an undue deprivation of property rights. (See *State v. Schaffer* (1973) 110 Ariz. 91 [515 P.2d 593, 600].)

" 'Bad faith' " is conduct that is not consistent with "the natural, ordinary, and legitimate use of real property," but rather is conduct undertaken "for the sole purpose of enhancing the damages to be recovered in an eminent domain action." (*State v. Schaffer, supra,* 515 P.2d at p. 600.) For example, in *In re Briggs Ave. in New York* (1909) 196 N.Y. 255 [89 N.E. 814], the owner moved a building upon land that the owner knew was to be taken by eminent domain, for the sole purpose of enhancing the compensation award. The New York Court of Appeals held that because the building was placed on the land in bad faith it remained personal property and should not be considered in determining the value of condemned land.

There is no suggestion of such bad faith in this case. As one commentator has pointed out: "It is the general rule that an owner is entitled to improve his or her property even though the owner knows that a public

improvement has been proposed which will result in condemnation of his or her land. The mere fact that a potential condemnor has proposed an improvement is merely that, namely a proposal, and as is the nature of proposals, not all are brought to fruition. At this stage of a public improvement, it would be manifestly unfair to deprive the owner of the legal use of the property." (4 Nichols on Eminent Domain, *supra*, § 13.12[3], pp. 13-106 to 13-107, fn. omitted.) Casa Sueños put its plans to develop the parcel on hold for approximately one year while it waited for District to find the funding for the elementary school project. It was only after District announced it was abandoning the elementary school project that Casa Sueños proceeded with developing the two lots. Given District's history of abandoning the project, Casa Sueños had no guarantee that District would proceed with the eminent domain proceedings until it was served with the summons. Also, during the period of time between District's abandonment of the school project and the time it announced it was going forward with it and would initiate eminent domain proceedings, Casa Sueños executed two contracts in the summer of 2001 to sell the manufactured homes. Thus, when District informed Casa Sueños in October 2001 that it was planning to proceed once again with the school project, Casa Sueños was under a contractual obligation to deliver completed manufactured homes to two buyers. (See *City of Santa Barbara v. Petras* (1971) 21 Cal.App.3d 506, 511 [98 Cal.Rptr. 635] [improvements made *after* service of summons may be considered in determining compensation if made in good faith pursuant to a preexisting contractual obligation].) Under these circumstances we cannot say Casa Sueños acted in bad faith in proceeding with the assembly and installation of the manufactured homes up until the time it was served with summons in the eminent domain action.

District's reliance on *Mt. San Jacinto Community College Dist. v. Superior Court, supra,* 117 Cal.App.4th 98, is misplaced. At the time the Mt. San Jacinto Community College District filed its eminent domain suit, the land was unimproved; the property owner began construction seven months later. (*Id.* at pp. 104–105.) After the college district won its motion in limine to prohibit evidence of the value of the improvements, the property owner filed an inverse condemnation action against the college district. (*Id.* at p. 101.) Noting that the property owner failed to seek court approval under section 1263.240, subdivision (c) for the postsummons improvements, the Court of Appeal ruled the property owner could not receive compensation for the improvements in the inverse condemnation action. (*Id.* at p. 108.) "[A] landowner may [not] deliberately forego the legislative remedy which safeguards its right to just compensation, construct improvements without the condemner's consent or judicial approval, and *still* demand compensation through an inverse condemnation action." (*Ibid.*)

### 3. *Health and Safety Code Section 18551 Is Not Applicable to Condemnation Proceedings*

District claims the two manufactured homes never became compensable improvements as a matter of law because Casa Sueños did not obtain certificates of occupancy and have the necessary documents recorded pursuant to Health and Safety Code section 18551, subdivision (a). We reject this claim, finding the Health and Safety Code provisions relating to manufactured homes, including section 18551, are not applicable to condemnation actions.

 Health and Safety Code section 18551 is part of the Mobilehome Parks Act (Health & Saf. Code, §§ 18200–18700), which, along with the Mobilehomes-Manufactured Housing Act (Health & Saf. Code, §§ 18000–18153), authorizes the Department of Housing and Community Development (Department) to regulate manufactured homes. For purposes of titling, registration, and taxation, the statutory scheme makes a distinction between those manufactured homes that are installed on a foundation system in accordance with Health and Safety Code section 18551, subdivision (a) and those that are not. (See *id.*, §§ 18075, 18075.5.)

Health and Safety section 18551, subdivision (a) establishes a procedure by which a manufactured home is installed on a foundation system as "a fixture or improvement to the real property." First, prior to the installation, a building permit must be obtained from the local enforcement agency. (*Id.*, § 18551, subd. (a)(1).) In addition to submitting plans and paying the required fees, the applicant must present proof that he or she holds title to or is purchasing the real property at the installation site and is the legal owner of the manufactured home, free of any liens or encumbrances, or, in the alternative that any lienors or encumbrancers consent to the attachment to the foundation. (*Ibid.*) If, after the manufactured home is installed on a foundation system, the local enforcement agency issues a certificate of occupancy, the agency, on the same day, is to record a document with the appropriate county recorder naming the owner of the real property, describing the real property and stating that a manufactured home has been affixed to the property. (*Id.*, § 18551, subd. (a)(2)(A).) Once this document is recorded with the county recorder, the manufactured home is deemed "a fixture and a real property improvement to the real property to which it is affixed." (*Id.*, § 18551, subd. (a)(4).)[21]

---

[21] Once installed in compliance with the statute, the manufactured home cannot be physically removed without the consent of all parties who, at the time of removal, have title to any real estate or interest in the real property to which the manufactured home is affixed. (Health & Saf. Code, § 18551, subd. (a)(4).) Also, a manufactured home installed on a foundation system in compliance with Health and Safety Code section 18551, subdivision (a) is exempt from registration with the Department; if previously registered, the registration is cancelled. (*Id.*,

Alternatively, under Health and Safety Code section 18551, subdivision (b), a manufactured home may be installed on a foundation system as a chattel. If the subdivision (b) procedure is followed, the treatment of sales and use or property taxes is not affected. (*Ibid.*)

District claims that Casa Sueños's failure to comply with Health and Safety Code section 18551, subdivision (a)—certificates of occupancy had not been issued and no documents had been recorded with the county recorder—rendered the two manufactured homes as chattel or personal property, which is not compensable under the Eminent Domain Law. In making this claim, District treats *"fixture or improvement to the real property,"* as used in Health and Safety Code section 18551, subdivision (a) (italics added), as synonymous with *"improvements pertaining to the realty,"* as used in section 1263.210 (italics added). However, these are distinct legal terms of art that pertain to different legal issues; they are not synonymous. Had the Legislature intended that they have the same meaning or serve the same purpose, it could have used the same phrasing in each instance or expressly provided so. (See *People v. Benson* (1998) 18 Cal.4th 24, 34 [74 Cal.Rptr.2d 294, 954 P.2d 557]; *Kirmse v. Hotel Nikko* (1996) 51 Cal.App.4th 311, 318 [59 Cal.Rptr.2d 96].)

 Further, nothing on the face of Health and Safety Code section 18551 indicates it has any application to the Eminent Domain Law. District has not supplied any rationale for applying the statute to condemnation proceedings other than: "There is no reason a condemnor as a purchaser of property should be treated differently than any other manufactured home owner or purchaser." We are not persuaded. The law has long recognized that a condemnation proceeding is not an arm's-length, voluntary transaction; rather, it is in effect a compulsory sale. (See, e.g., *People ex rel. Pub. Wks. v. Lynbar, Inc.* (1967) 253 Cal.App.2d 870, 880 [62 Cal.Rptr. 320].)

Moreover, application of Health and Safety Code section 18551 to condemnation law here would defeat Casa Sueños's right to just compensation. A statute cannot defeat a condemnee's constitutional right to just compensation. (*Redevelopment Agency v. Gilmore, supra,* 38 Cal.3d at p. 797.)

Finally, we note that District's interpretation is belied by the legislative history and purpose of Health and Safety Code section 18551.

 To the extent the language of a statute is susceptible of more than one reasonable interpretation, we will consider " 'a variety of extrinsic aids,

---

§§ 18075.5, subd. (b), 18551, subd. (a)(3).) Further, such manufactured home is no longer subject to vehicle license fees and to taxation as personal property. (Rev. & Tax. Code, §§ 5801, 10784.) It is subject to ad valorem taxes as real property. (*Ibid.*)

including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Wilcox v. Birtwhistle* (1990) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727], quoting *People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

The legislative history of Health and Safety Code section 18551 does not disclose any legislative intent to have the statute affect condemnation proceedings. Rather, the legislative history shows the statute was enacted as part of legislation intended to promote mobilehomes as a low- or moderate-cost housing alternative for Californians. (Stats. 1979, ch. 1160, §§ 1–17, pp. 4342–4361; see also Dept. of Housing & Community Development, Enrolled Bill Rep. on Assem. Bill No. 887 (1979–1980 Reg. Sess.) Sept. 21, 1979, p. 3.)

Up until a quarter of a century ago, it was illegal to place a mobilehome on a permanent foundation, and mobilehomes largely were classified as motor vehicles for tax purposes, even though many were residential in nature. (See Assem. Com. on Housing & Community Development, Analysis of Assem. Bill No. 887 (1979–1980 Reg. Sess.) as proposed to be amended Apr. 11, 1979, pp. 1–2.) This was the case even though, as one commentator has noted: "Notwithstanding its semimobility, the modern mobilehome bears little resemblance to its historical predecessors, the travel trailers of the 1920s and 1930s." (11 Miller & Starr, Cal. Real Estate (3rd ed. 2001) § 31:1, p. 5.) By the late 1970's, the mobilehome industry offered mobilehomes with floor space and amenities comparable to new conventional houses at roughly half the structure cost per square foot. (Dept. of Housing & Community Development, Enrolled Bill Rep., Assem. Bill No. 887 (1979–1980 Reg. Sess.) Sept. 21, 1979, p. 3.) However, fewer than expected Californians were choosing mobilehomes for homeownership because of their "anachronistic legal and tax status as vehicles." (*Ibid.*) Also contributing to the low number was restrictive zoning by local governments, which generally opposed mobilehomes because their tax status resulted in less local revenue per unit than property taxation on conventional houses. (*Ibid.*)

In 1979, the Legislature addressed these issues by passing Assembly Bill No. 887, which made it legal to install mobilehomes on foundations and revamped the tax status of those mobilehomes that were installed on foundations. (Stats. 1979, ch. 1160, §§ 1–14, pp. 4342–4360.) Among other things, the legislation (1) redefined mobilehome, for purposes of specified provisions, as a structure to be used with or without a foundation system; (2) required certain conditions be met to have a mobilehome installed on a foundation; (3) required the Department to adopt regulations for acceptable foundation

systems for mobilehomes; (4) decreed that mobilehomes installed on foundation systems were subject to state enforced health and safety standards; (5) eliminated the requirement to register mobilehome with the Department of Motor Vehicles if installed for occupancy as a residence on a foundation system; (6) subjected mobilehomes installed on foundation systems to local property tax rather than state vehicle license fee tax; and (7) allowed only 40 percent of the normal sales tax to be applied on mobilehomes installed on a foundation. (*Ibid.*) Health and Safety Code section 18551 contained those provisions addressing the foundation systems of mobilehomes. It set forth the requirements for installing a mobilehome on a foundation system, gave regulatory authority to the Department, provided for the cancellation of motor vehicle registration of mobilehomes installed on foundation systems, and established a statewide procedure to have mobilehomes classified as either "a fixture or improvement to [the] real property" or as personal property. (Stats. 1979, ch. 1160, § 7, p. 4358.)

The gist of the legislation was to "regard mobilehomes as housing rather than vehicles" and to assure they become "a reasonably affordable means to secure housing." (Assem. Off. of Research, 3d reading analysis of Assem. Bill No. 887 (1979–1980 Reg. Sess.) June 26, 1979, p. 2.) The Legislature reasoned that by giving a mobilehome owner the option to install the mobilehome on a foundation and thereby place it on the property tax rolls, the legislation would make mobilehomes a more attractive option for home-owners and reduce resistance to them by local governments. (Dept. of Housing & Community Development, Enrolled Bill Rep. on Assem. Bill No. 887 (1979–1980 Reg. Sess.) Sept. 21, 1979, p. 3.)

From our reading of the various analyses of Assembly Bill No. 887, we glean the Legislature distinguished between mobilehomes installed on foundation systems as "improvements" and therefore as real property, and all other mobilehomes as personal property to establish property tax liability for mobilehomes. The Legislative Counsel opined:

"A mobilehome which is permanently affixed to real property would be an improvement, for property tax purposes and 'improvements' are classified as real property [citation]. Moreover, for approximately 100 years [citation] 'improvements' have been defined in approximately the same manner as they are presently defined in subdivision (a) of Section 105 of the Revenue and Taxation Code. This subdivision specifies that, for purposes of property taxation, 'improvements' shall include: [¶] '(a) All buildings, structures, fixtures, and fences erected on or affixed to the land, except telephone and telegraph lines.'

"Therefore, unless a mobilehome has become affixed to the land in such manner as to become an improvement, it would not be subject to property

taxation as real property, but would be properly characterized as personal property, which may be exempted from taxation by the Legislation [citation]." (Ops. Cal. Legis. Counsel, No. 9935 (June 25, 1979) Property Taxes: Mobilehomes, p. 3.)

Having reviewed the legislative history of Health and Safety Code section 18551, we do not find anything that suggests the provisions of the statute were meant to apply to condemnation law. To the contrary, the legislative history shows that the Legislature intended Health and Safety Code section 18551 to be part of a regulatory, licensing and taxation vehicle to promote mobilehomes as an affordable housing alternative for low- and moderate-income Californians. We cannot " 'carry the operation of [a statute] far beyond the legislative intent and thereby make its provisions apply to transactions never contemplated by the legislative body.' " (*People ex. rel. Dept. of Transportation v. Southern Cal. Edison Co.*, *supra*, 22 Cal.4th at p. 798.)[22]

On the other hand, the Legislature clearly intended the Eminent Domain Law to be self-contained. Section 1230.020 provides: "Except as otherwise specifically provided by statute, the power of eminent domain may be exercised only as provided in this title." The "major propose" of the Eminent Domain Law "is to cover, in a comprehensive manner, all aspects of condemnation law and procedure." (13 Cal. Law Revision Com., *supra*, p. 1011, fn. omitted.) Moreover, application of Health and Safety Code section 18551 to eminent domain proceedings would be antithetical to the expansive view of compensable fixtures that marks California condemnation law.

## C. *Valuation Issues*

District contends the trial court erred in admitting the expert testimony of appraiser Betteker because Casa Sueños did not comply with the statutes requiring pretrial exchange of valuation data. District also challenges the

---

[22] We do not intend the foregoing discussion to be read as suggesting that Health and Safety Code section 18551 has no application to the two manufactured homes in this case. These manufactured homes clearly came within the definition of manufactured homes used in the Mobilehome Parks Act (see Health & Saf. Code, §§ 18007, 18210.5) and would be subject to the requirements of Health and Safety Code section 18551, subdivision (a) before certificates of occupancy could be obtained and the structures recorded as "fixture[s] or improvement[s] to the real property," and thereby have the concomitant regulatory, licensing and taxation consequences. Casa Sueños conceded as much at trial. The issue presented in this case only deals with whether Health and Safety Code section 18551 applies to a condemnation proceeding and requires governmental approval as set forth in the statute before a manufactured home can be considered an "improvement[] pertaining to the realty" under Code of Civil Procedure section 1263.210.

testimony of Betteker on the basis that he (1) used an incorrect definition of fair market value, (2) did not adequately confirm the reliability of the sales data used in his comparable sales analysis and (3) appraised Casa Sueños's property as though it were fully developed and ready for occupancy.

## 1. Exchange of Valuation Data

### The Law

The discovery statutes applicable to an eminent domain action require each party to serve upon the opposing party its list of expert witnesses and a statement of valuation data not later than the date set for exchange of this information. (See §§ 1258.230, 1258.250.) Section 1258.220 provides that, unless another date is agreed to by the parties or set by court order on good cause shown, the parties to a condemnation proceeding are to exchange statements of valuation data 90 days before trial. (§ 1258.220, subd. (a).) A statement of valuation data must be exchanged for each witness who will testify to his opinion regarding the value of the land and any other amount of compensation required under the Eminent Domain Law. (§ 1258.250, subds. (a), (d).) Among other items, the statements must disclose: (1) the witness's opinion of value; (2) the date of valuation used by the witness; (3) all comparable sales, replacement cost calculations, and net income projections supporting the expert's opinion; and (4) the names of all other experts on whom the expert is relying. (§ 1258.260, subds. (a)–(c).)

Absent relief from the court, a designated expert cannot testify for a party in its case-in-chief unless the party timely served a statement of valuation data, and the expert cannot testify as to any opinion or data that was required to be included in the statement pursuant to section 1258.250, but was omitted. (§ 1258.280, subd. (c).) The intent behind providing a sanction is "to insure that the parties make a good faith exchange of lists of expert witnesses and essential valuation data." (13 Cal. Law Revision Com. Rep., *supra*, p. 1190.)

Section 1258.290 authorizes the court to relieve a party from its default under the eminent domain discovery provisions if: (1) the party made a good faith effort to comply by the date of exchange and gave written notice of any changes necessary in its statement thereafter (see § 1258.270); and (2) either the party could not in the exercise of reasonable diligence have determined that changes were necessary in its expert's opinion or data, or the failure to provide a complete valuation statement was the result of mistake, inadvertence, surprise, or excusable neglect. (§ 1258.290, subd. (a).) Section 1258.290 further provides that in determining whether to provide relief under the statute, the court must take into account the extent to which the opposing party relied upon the original statement of valuation data and would be prejudiced by allowing the expert's testimony. (§ 1258.290, subd. (b).)

*Factual Background*

On July 12, 2002, District filed and served a demand for exchange of valuation data. (§ 1258.210.) On November 18, Casa Sueños served its list of expert witnesses and statement of valuation data, including one for Betteker.[23]

On December 5, District deposed Betteker. Betteker disclosed he used September 11, 2001, as the date of valuation and had only appraised one of the two lots.

The original trial date of January 17, 2003, was continued twice at Casa Sueños's request. The court twice said it would not reopen discovery.

On April 7, Casa Sueños served District with a revised statement of valuation for Betteker. In the revised statement, Betteker used the correct date of valuation and included an appraisal for the second lot.

*The Trial Court's Ruling*

District moved to exclude Betteker's opinions on the basis of section 1258.280. In denying the motion, the trial court said:

". . . I am going to allow Mr. Betteker to testify.

"Frankly, I'm really unhappy with the way that all came about. But I had a hard time when I went back and looked at everything seeing any prejudice to the [D]istrict because you knew they only had the one appraisal expert. You couldn't have expected them to just say, 'So we're going to skip parcel No. 2.'

"And when I went back and read the deposition testimony that was provided to me, I didn't see any questions in there asking whether Mr. Betteker still had work to do, whether he was still in the process of doing anything, whether he would be forming additional opinions, and that sort of thing.

"He was asked whether or not he had an opinion as to that parcel. He said not at this time.

---

[23] Betteker, a certified residential appraiser with 18 years of experience, had never valued property in a condemnation case before. Casa Sueños had earlier hired Betteker to appraise the property when it was considering its listing price for the developed lots.

"So—and I do think attempts were made to allow [District] access to Mr. Betteker for the purposes of [further] deposition at the defense cost. I understand the timing issue in that regard. I'm not real pleased about that either.

"But I don't think that [the judge assigned to the case earlier] stating . . . something to the effect that discovery was closed or we're not going to reopen it, or whatever the exact wording was, meant that discovery that had already been done or in process could not be wrapped up, clarified, whatever you want to call it. Certainly no new discovery could take place. I don't think that this fell into that category."

*Analysis*

■ We begin by observing that we share the concerns of the trial court over the way Casa Sueños largely disregarded not only the letter of the law, but the spirit as well in this critical area of exchanging valuation data. California's Eminent Domain Law provides specific discovery requirements designed to ensure valuation data of the condemned property is exchanged in a meaningful and timely fashion. In addition to impacting the amount of just compensation awarded, the exchange of valuation data impacts the parties' offers and demands, which in turn can affect the award of litigation expenses. Casa Sueños showed a cavalier approach to its responsibilities under the law, beginning with its decision to use the same appraiser it had earlier used for an unrelated appraisal (see fn. 23, *ante*), and by its subsequent failure to make sure he used the correct valuation date, appraised both properties, and was ready to testify when it presented him for deposition. To suggest, as Casa Sueños does in its respondent's brief, that its initial statement of valuation substantially complied with the requirements of the Eminent Domain Law borders on the absurd.

Having said that, we recognize that Casa Sueños tried to informally rectify the shortcomings of its initial statement of valuation by directing Betteker to appraise the other lot and make sure both appraisals used the correct date of valuation, and by offering to make Betteker available for another disposition at its expense. At the same time, we recognize District exercised its right to reject those attempts as outside of the statutory scheme.

After careful consideration, we conclude the court acted within its discretion in allowing Betteker to testify, principally because the prejudice to District was slight. (See § 1258.290, subd. (b).) Part of the court's ruling was to delay the start of the trial to give District the opportunity to depose Betteker again. Significantly, the bottom line difference between the appraisals in the original and amended statements of valuation data was $10,000 per

lot, which is not a substantial amount in the housing market of the time. District's counsel argued below that Betteker should not be given a second chance to correct his faulty methodologies, but the court's ruling did not prevent counsel from bringing out Betteker's appraisal shortcomings during cross-examination. Although District claimed that it made its statutory final offer based on Betteker's first deposition, it does not appear to have been a major factor. From the beginning, District's theory of the case was that the manufactured homes were not "improvements pertaining to the realty" (§ 1263.210), and its final offer was a product of that theory. It does not readily follow that District's statutory final offer of $180,000 for the property was largely dependent on Betteker's answers during the first deposition. Finally, we note Casa Sueños offered to correct the statement when the deficiencies came to its attention. Although Casa Sueños should have formally filed notice of a revised statement of valuation data pursuant to section 1258.270, subdivision (a)(3) much earlier, there was no showing of bad faith in this regard by Casa Sueños.

## 2. *Incorrect Definition of Fair Market Value*

■ The measure of compensation for property taken pursuant to the government's powers of eminent domain is its "fair market value." (See § 1263.310.) "Fair market value" is defined as "*the highest price* on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a), italics added.) Section 1263.320, subdivision (a) codifies the definition of fair market value, which has evolved through the case law. (13 Cal. Law Revision Com. Rep., *supra*, p. 1211.) In *South Bay Irr. Dist. v. California-American Water Co.* (1976) 61 Cal.App.3d 944, 967–968 [133 Cal.Rptr. 166], this court explained how the definition developed:

"The term 'just compensation', as used in the constitutional provision guaranteeing the payment of such upon the taking of private property for public use is not constitutionally defined; the elements comprising such are not constitutionally identified; and the courts, in the exercise of their power to interpret and enforce constitutional provisions, have been required to provide tests or measures to effect the constitutional purpose. Considering this problem, as it applies to property actually taken, the United States Supreme Court, in *United States v. Miller* [(1943)] 317 U.S. 369, 373–374 [87 L.Ed. 336, 63 S.Ct. 276], stated: 'It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of

each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the "value," the "market value," and the "fair market value" of what is taken. The term "fair" hardly adds anything to the phrase "market value," which denotes what "it fairly may be believed that a purchaser in fair market conditions would have given," or, more concisely, "market value fairly determined" '; also 'It is usually said that market value is what a willing buyer would pay in cash to a willing seller.'

"The California Supreme Court, in the early case of *Spring Valley W.W.* v. *Drinkhouse* [(1891)] 92 Cal. 528, 533 [28 P. 681] [overruled on other grounds in *County of Los Angeles v. Faus, supra*, 48 Cal.2d 672, 680,] accepted the concept that the market value of property taken for public use equates 'just compensation' for the taking as the measure thereof in an eminent domain action; and is determined in view of all of the facts which would naturally affect its value in the minds of sellers and purchasers. In *Sacramento etc. R.R. Co.* v. *Heilbron* [(1909)] 156 Cal. 408, 409 [104 P. 979], the court gave definitive meaning to the measure theretofore approved and said: '[T]he rule is of universal acceptance that the measure of this damage is the market value; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable.'

"The *Heilbron* definition of market value became the basis (1) of a refined and more explicit statement of the definition of [market value]. . . .

"Market value as thus defined has been accepted and applied by the courts of California as the general rule governing the determination of just compensation in eminent domain actions [citations]." (Fns. omitted.)

District claims Betteker used an improper definition of fair market value because his property appraisal was on a Fannie Mae Form 2055 9-96 form, which contained the following definition of market value: "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial

arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale." (Fn. omitted, italics added.)

Betteker testified that "the most probable price" definition used on the form was the same as "the highest price" statutory definition because in his appraisals the most probable price that the seller can expect to receive in a competitive market is the highest price possible in that market on the date of valuation. In essence, Betteker testified that despite the differing language of the form, the definitions were in fact identical and he used the statutory definition of fair market value in appraising the property.

■ What is determinative is Betteker's opinion—articulated during his expert testimony—not language on the form he used. (Evid. Code, § 813, subd. (a).) Evidence Code section 813, subdivision (a) provides that property value "may be shown only by the opinions" of experts and owners. Betteker was subject to cross-examination on his appraisal methodology, including the language on the Fannie Mae form and whether its definition of fair market value differed from the statutory definition. The court, sitting as trier of fact, could decide what weight to give to Betteker's appraisal in light of the language on the form. (See *State of California ex rel. State Public Works Board v. Wherity* (1969) 275 Cal.App.2d 241, 249 [79 Cal.Rptr. 591].) Evidence Code section 813 does not bar admission of other evidence for the limited purpose of enabling the trier of fact to weigh the opinions of valuation witnesses. (275 Cal.App.2d at p. 249.) "The trier of fact . . . is not required to accept the opinion testimony of any witness as to value[;] may accept that part of such testimony [it] concludes worthy of belief and reject that part which is unworthy of belief . . . ; and, in determining the amount of just compensation in an eminent domain action, is not required to coincide his determination with the specific amount fixed by the valuation testimony of any expert witness . . . ." (*South Bay Irr. Dist. v. California-American Water Co., supra,* 61 Cal.App.3d at pp. 965–966, citations omitted.)

The court, aware of the language on the Fannie Mae form, apparently found credible Betteker's testimony that he in fact used the statutory definition of fair market value because it adopted his appraisal in setting the just compensation. We find no error.

3. *Failure to Confirm Data*

■ To assure reliable comparisons, an appraiser must confirm the price, date of agreement, terms of sale, and other relevant data, such as whether the sale was voluntary or under compulsion, with the principals or through their

brokers, the lender, the escrow agent or an attorney who handled the transaction. (1 Condemnation Practice in Cal. (Cont.Ed.Bar 2d ed. 1995) § 4.37(2), p. 130.)

Betteker obtained the information for the comparable sales he used in his appraisal from a computer reporting service. According to Betteker's deposition testimony, he had not confirmed any of the comparable sales data contained in his appraisal with the parties to the transaction. Of five comparable sales Betteker used, he contacted the seller's agent in only one instance.

There was no error in admitting the comparable sales despite Betteker's failure to obtain first-hand verification. Evidence Code section 816 does not require verification of comparable sales. Also, the fact that the comparable sales data was not verified does not render the evidence inadmissible as opinion evidence of another property under Evidence Code section 822, subdivision (a)(4). (See *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478, 501–502 [93 Cal.Rptr. 833, 483 P.2d 1].)

We note that in considering whether to admit evidence on an allegedly noncomparable sale, the trial court's task "is to determine whether the sale price of one property could *shed light* upon the value of the condemned property, notwithstanding any differences that might exist between them. If it resolves that question affirmatively, it can admit the evidence. The jury then, on the basis of all the evidence, determines the extent to which any differences between the condemned property and the comparable property affect their relative values." (*City of Los Angeles v. Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 482 [128 Cal.Rptr. 436, 546 P.2d 1380].) "[E]vidence of comparable sales is properly received if the judge, in the exercise of a wide discretion, is satisfied that the price paid 'was sufficiently voluntary to be a reasonable index of value.' " (*People ex. rel. Dept. of Public Works v. Wasserman* (1966) 240 Cal.App.2d 716, 739 [50 Cal.Rptr. 95].) We cannot say on this record the trial court abused its discretion by allowing Betteker's testimony.

To be sure, Betteker failed to follow the best appraisal practices. But his failure to verify the comparable sales data did not render the evidence inadmissible. The failure to obtain firsthand verification goes to the weight and credibility of Betteker's comparison methodology. Betteker's failure to verify the comparable sales data was brought to the attention of the court, sitting as trier of fact, and it was a factor that the court could properly weigh in assessing Betteker's testimony.

*Appraisal of Property as If It Were Fully Developed*

Betteker used an appraisal form that contained the following language:

"The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed."

"This appraisal is made subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed."

Betteker also testified that he appraised the lots on the basis that the improvements had been completed.

District contends it was error to allow Betteker's testimony because work on the manufactured homes was not completed as of November 19, 2001, when Casa Sueños was served with the complaint and summons.

■■■ We reject District's argument that Betteker's appraisal violated section 1263.240, which prohibits postsummons improvements to be taken into account in determining compensation. At trial it was understood that (1) Betteker's appraisals—based on the assumption that the project was completed—did not by themselves constitute Casa Sueños's evidence as to the value, and (2) the cost of completion—an undisputed figure—was to be subtracted from Betteker's appraisals to arrive at the valuation. Betteker testified accordingly, stating the net value of the property was $494,850 based on a deduction of $35,150 (the cost of completion) from $530,000 (the appraised value).

■■■ We find this methodology legally sound. (See Evid. Code, § 822; *Buena Park School Dist. v. Metrim Corp.* (1959) 176 Cal.App.2d 255, 259–261 [1 Cal.Rptr. 250].) In essence, Casa Sueños presented a modified comparable sales method of valuation. (See Evid. Code, § 816.) Under the comparable sales approach, "the appraiser identifies sales of properties deemed to resemble the condemned property in relevant respects, and then derives a market value for the condemned property from the prices paid for these 'comparables,' typically adjusting the price to reflect such matters as material differences between the properties and differences in market forces between the time and location of the comparable sale and that of the property being valued." (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.,* *supra,* 101 Cal.App.4th at p. 1094.) In presenting its valuation, Casa Sueños modified Betteker's comparable sales appraisals by deducting the cost to

finish the project since the comparable sales were of completed properties. Evidence Code section 823 provides in pertinent part: "[T]he value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable."

II

### CASA SUEÑOS'S APPEAL

Casa Sueños contends it was an abuse of discretion to deny it litigation expenses. We find no abuse of discretion.

■ The award of litigation expenses in a condemnation proceeding is governed by section 1250.410, which provides in relevant part:

"(a) At least 20 days prior to the date of the trial on issues relating to compensation, the plaintiff shall file with the court and serve on the defendant its final offer of compensation in the proceeding . . . . These offers and demands shall be the only offers and demands considered by the court in determining the entitlement, if any, to litigation expenses. . . .

"(b) If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed pursuant to Section 1268.710 shall include the defendant's litigation expenses."

"(d) If timely made, the offers and demands as provided in subdivision (a) shall be considered by the court on the issue of determining an entitlement to litigation expenses."

Section 1250.410 is intended to protect the property owner from being forced unnecessarily to litigate the value of the property sought to be condemned. (*Los Angeles County Flood Control Dist. v. Mindlin, supra,* 106 Cal.App.3d at p. 717.) Under the statute, the court is to view the reasonableness of the offer and the demand in the light of the evidence presented and the compensation awarded. (*Ibid.*)

The following factors apply in determining whether an offer was reasonable under section 1250.410: " ' "(1) the amount of the difference between the offer and the compensation awarded, (2) the percentage of the difference between the offer and the award . . . and (3) the good faith, care and accuracy in how the amount of the offer and amount of demand, respectively, were

determined." ' " (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp., supra*, 16 Cal.4th at p. 720.) The Supreme Court went on to caution lower courts: "[T]he mathematical relation between the condemner's highest offer and the award is only one factor that should enter into the trial court's determination." (*Ibid.*)

In denying Casa Sueños litigation expenses, the court considered the above-recited criteria and found "that notwithstanding the amount of the difference, and the percentage of difference, between the offer and the award, [District] exercised good faith, care and accuracy in determining the amount of the offer." The court pointed out, contrary to Casa Sueños's view, that the central issue in the case—whether the manufactured homes were "improvements pertaining to the realty"—was a complex one, District's position was a legitimate one and District was not required to abandon its position before the court ruled against it. Among other things, the court noted: "I don't feel they should have done anything but what they did." The court also pointed out that many of the problems of the case were caused by the way Casa Sueños handled the exchange of its valuation data and the unpreparedness of its expert. The court observed that its ruling allowing Casa Sueños to present a revised statement of valuation was a close call.

■ " ' "[R]easonableness of the final offer and demand presents factual issues . . . which are matters to be evaluated by the fact finder." ' " (*County of San Diego v. Woodward* (1986) 186 Cal.App.3d 82, 89 [230 Cal.Rptr. 406].) "The trial court's determination of [reasonableness] will not be disturbed on appeal if supported by substantial evidence." (*Redevelopment Agency v. Gilmore, supra*, 38 Cal.3d at p. 808.)

■ In our view, the trial court's finding of reasonableness was supported by substantial evidence. We acknowledge that if our review was based strictly on the numbers, District's revised final offer of $200,000 was significantly disproportionate to the ultimate award and was only slightly more than half of Casa Sueños's final demand. (See fn. 7, *ante.*) However, this case was more about the legal issue of whether the manufactured homes were "improvements to the realty" under section 1263.210 than it was about numbers. This legal issue was the crux of the parties' disagreement. District's stance that the manufactured homes were not "improvements pertaining to the realty" because they did not have certificates of occupancy was not unreasonable. The question of applying Health and Safety Code section 18551 to condemnation law was a novel issue, and arguments in support of applying it were by no means frivolous. A condemning agency need not "compromise its legal position just to avoid litigation." (*San Diego Metropolitan Transit Development Bd. v. Cushman, supra*, 53 Cal.App.4th at p. 933.)

■ Under section 1250.410, the trial court is to make a discretionary determination of reasonableness after weighing the evidence and credibility of the witnesses and counsel. (See *County of San Diego v. Woodward, supra,* 186 Cal.App.3d at p. 90.) Here, the court was in the best position to evaluate reasonableness based on the evidence and credibility of counsel. Its conclusion was supported by substantial evidence and we find no abuse of discretion.

## DISPOSITION

The judgment is affirmed. The denial of Casa Sueños's motion for litigation fees is affirmed. Each party shall bear its own costs on appeal.

Huffman, Acting P. J., and Nares, J., concurred.