[No. A070572. First Dist., Div. One. Nov. 27, 1996.]

W. ANDREWS KIRMSE, Plaintiff and Appellant, v.
HOTEL NIKKO OF SAN FRANCISCO, INC., Defendant and
Respondent.

[No. A071366. First Dist., Div. One. Nov. 27, 1996.]

W. ANDREWS KIRMSE, Plaintiff and Respondent, v.
HOTEL NIKKO OF SAN FRANCISCO, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.-V. of the Discussion.

312

COUNSEL

Knox Ricksen, Richard G. Logan, Jr., Anthony & Carlson and Steven R. Anthony for Plaintiff and Appellant and for Plaintiff and Respondent.

Ballard, Rosenberg & Golper, Richard S. Rosenberg and John J. Manier for Defendant and Appellant and for Defendant and Respondent.

## OPINION

**SWAGER, J.**—The plaintiff in an action for employment discrimination and wrongful discharge, W. Andrews Kirmse, appeals from a judgment dismissing his complaint against his former employer, Hotel Nikko of San Francisco, Inc. (hereafter Nikko S.F.), a California corporation, and its parent company, Japan Airlines Development Corporation, Ltd. (hereafter JALDC), a Japanese corporation.[1] We affirm.

### PROCEDURAL BACKGROUND

In a first amended complaint filed in San Francisco Superior Court, Kirmse alleges four causes of action: (1) breach of contract, (2) employment discrimination on the basis of race and national origin in violation of the California Fair Employment and Housing Act (hereafter FEHA), (3) wrongful termination in violation of public policy, and (4) intentional interference with contractual relations. The first two causes of action name Nikko S.F. as defendant; the third names both Nikko S.F. and JALDC; and the fourth names JALDC alone.

The defendants, Nikko S.F. and JALDC, moved for summary adjudication of each cause of action on alternative grounds. In an order entered March 15, 1995, the trial court granted summary adjudication of each cause of action, specifically stating that the second and third causes of action were barred by the Japanese Friendship, Commerce and Navigation Treaty of 1953 (hereafter Japanese FCN Treaty). The court subsequently entered a judgment of dismissal and denied a motion for attorney fees under the FEHA filed by Nikko S.F. and JALDC. Kirmse appeals from the judgment of dismissal, and Nikko S.F. and JALDC separately appeal from the order denying attorney fees.

### FACTUAL BACKGROUND

The San Francisco Hotel Nikko is a 520-room hotel which is part of a worldwide chain of 37 hotels of that name operated by Japan Airlines

---

[1] Nikko S.F. is formally controlled by Japan Airlines Development (U.S.A.), Inc., which in turn is wholly owned by JALDC. Since the record contains no evidence indicating that Japan Airlines Development (U.S.A.), Inc., played an independent role in management of Nikko S.F., its existence is immaterial to our analysis. In this opinion, we will refer to JALDC as the parent company of Nikko S.F.

through a subsidiary JALDC. The hotel is owned by a joint venture consisting of JALDC and Takanaka Corporation. JALDC invested $220 million in building the hotel which opened in 1986 and owns a 49 percent interest in the real estate. The management of the hotel has been entrusted to JALDC's California subsidiary, Nikko S.F.

In October 1986, Kirmse was recruited to serve as general manager of the San Francisco Hotel Nikko. The terms of his employment were set forth in a letter dated October 21, 1986. An experienced hotel executive, he had spent his entire career in this field after graduating from Cornell University in 1967 with a degree in hotel administration. As general manager, he was a vice-president of Nikko S.F. and reported directly to a vice-president of JALDC, Akira Osawa, who managed the Hotel Nikko chain at the home office in Tokyo and served as president of Nikko S.F. Since June 1990, a JALDC employee, Fumio Moroi, has served as assistant general manager of the hotel. A Japanese citizen, Moroi worked for Nikko S.F. under a separate system of personnel administration applying to "JALDC expatriates," i.e., JALDC employees with temporary "E" visas posted in the United States, and he was evaluated by Osawa rather than Kirmse. He received a salary just under that of Kirmse. For several years, Moroi spent most of his time in matters relating to JALDC's real estate investment in the hotel, such as financing, maintenance and permits, but he was also involved in hotel management. As assistant general manager, Moroi reported to Kirmse on operational matters but was in regular communication with Osawa, submitting several reports every week. Among other things, Moroi reported on the job performance of Kirmse, his ostensible superior. Kirmse was never told, and claims he never suspected, that he was being evaluated by a subordinate.

In 1992, the JALDC management announced that it would assign a new assistant manager position for marketing and sales in each of its hotels in the United States. The Nikko chain of hotels, which enjoys a high reputation in East Asia, relied heavily on a clientele of Japanese and Asian businessmen in the United States. Yutaka Fujita assumed the newly created position at Nikko S.F. in July 1992. Like Moroi, he served under a separate system of personnel administration and was evaluated by JALDC executives rather than Kirmse.

During the seven years he served as general manager, Kirmse received good job evaluations and personal commendations from both Osawa and David Lloyd, a vice-president of Hotel Nikko (U.S.A.), a wholly owned subsidiary of JALDC formed to assist the operations of each hotel in the United States. Under his management, the hotel was chosen for a national convention of travel agents and ranked high in public opinion surveys,

magazine reviews and "AAA" ratings. Kirmse himself was named general manager of the year by Business Traveler Magazine. His personnel file was conspicuously free of criticisms or negative reports. Nevertheless, the hotel (like other Hotel Nikkos in the United States) consistently lost money under his management. Shifting from the high end of the business, the hotel began to seek less remunerative patronage from airline crews and tours. The hotel staff was reduced from over 400 to about 300 employees. As part of its attraction as a prestige hotel, the hotel featured a quality Japanese restaurant, known as Benkay, which operated at a loss in the competitive San Francisco market.

In a memo dated April 27, 1993, Kirmse reported to Osawa that the hotel incurred higher personnel expenses at the "division head" level than its competition in San Francisco. He recommended closing the restaurant and cutting management staff by three or four persons. He later proposed a more specific plan at a quarterly operations review meeting on August 4 and 5, 1994.

Shortly before the meeting, the hotel's executive assistant manager Alain Ané announced plans to leave the company and tendered his resignation. According to Kirmse, Ané told him that he was disillusioned with the business policies of JALDC and intended to return to his home in Atlanta. Kirmse urged him to hold off his resignation until after the quarterly meeting and returned his draft resignation letter to him. At the quarterly meeting, Kirmse recommended a reorganization of the division level staff at the hotel involving the discharge of three executives: the JALDC expatriate, Fujita, the director of food and beverage, Nicholas Daeppen, and a personnel executive, Hilary Binko, and the promotion of Alain Ané to the position of assistant general manager. He criticized the job performance of Fujita and recommended closing the Benkay restaurant. Osawa rejected his suggestions. Afterwards, Kirmse thanked Ané for delaying his resignation until after the meeting and said he would submit his resignation to JALDC management.

The defendants' witnesses gave a different account. Both Moroi and Lloyd testified that Ané informed them before the meeting that he was resigning because of frustration in working for Kirmse. They in turn informed Osawa of his resignation. They were surprised when Kirmse said nothing of Ané's resignation at the quarterly meeting but rather proposed a reorganization scheme featuring his promotion. After the meeting, Lloyd asked Ané if he would stay if Kirmse left the company. Ané responded affirmatively.

According to management spokesmen, JALDC happened to hire in late July a management consultant, Carlos Restrepo, to investigate the vulnerability of the hotel to union organization. In early August 1993 Osawa and

Lloyd met Restrepo at the San Francisco International Airport. Restrepo reported that Kirmse was poorly accepted by the staff while Ané was highly regarded. Shortly after Restrepo departed on his flight, the JALDC labor-management attorney, Richard Rosenberg, arrived on another flight. Osawa and Lloyd talked to Rosenberg at the airport for one or two hours.

The next day, Kirmse was summoned to a meeting with Osawa, Lloyd and Moroi. Osawa told him that JALDC was restructuring management to cut costs and the position of general manager was being eliminated. He would be given 90 days' pay as severance in lieu of the notice required by his management agreement. At his deposition, Osawa stated that the reason for the decision was "economic." But JALDC later advanced an alternative explanation for Kirmse's discharge. After hearing Restrepo's report, the JALDC management realized that Ané was more important to the hotel than Kirmse. Since Ané would not work under Kirmse, they were put to a choice: Ané or Kirmse. They decided to discharge Kirmse and retain Ané.

After Kirmse's departure from the company, Moroi moved into Kirmse's office without receiving a formal promotion. Ané was promoted to assistant general manager with responsibilities over marketing, sales, room management, and food services. The two executives managed the hotel as a team without the necessity of a single general manager. Other cost-cutting measures were adopted in the months following: Fujita was transferred, the Benkay restaurant was closed, and the director of food and beverage, Daeppen, was terminated.

DISCUSSION

I.

*The Japanese FCN Treaty*

As a first assignment of error, Kirmse argues that the trial court erred in holding that article VIII(1) of the Japanese FCN Treaty (4 U.S.T. 2063, T.I.A.S. No. 2863) bars his causes of action for employment discrimination. The Japanese FCN Treaty is one of a series of treaties, with a similar pattern and many common provisions, negotiated after World War II with over two dozen nations. The treaties have primarily a commercial focus. In the words of a United States negotiator, "[t]hey define the treatment each country owes the nationals of the other; their rights to engage in business and other activities within the boundaries of the former; and the respect due them, their property and their enterprises." (Walker, *Modern Treaties of Friendship, Commerce and Navigation* (1958) 42 Minn. L.Rev. 805, 806.)

Article VIII(1) of the Japanese FCN Treaty is a standard provision intended to give both parties to the treaty a degree of discretion in staffing enterprises operating in the other's country with managerial or technical personnel from the home country. (Ishizuka, *Subsidiary Assertion of Foreign Parent Corporation Rights under Commercial Treaties to Hire Employees "of their Choice"* (1986) 86 Col. L.Rev. 139.) It provides in pertinent part: "[C]ompanies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice." (4 U.S.T. 2063, 2070.)

We note at the outset that the United States Supreme Court decision in *Sumitomo Shoji America, Inc.* v. *Avagliano* (1982) 457 U.S. 176 [72 L.Ed.2d 765, 102 S.Ct. 2374] (hereafter *Sumitomo*) *has* established that the Japanese FCN Treaty does not apply to a domestically incorporated subsidiary of a Japanese corporation. The plaintiffs in *Sumitomo* were employees of Sumitomo Shoji America, Inc., a New York corporation wholly owned by a Japanese parent company. Holding that article VIII(1) of the Japanese FCN Treaty did not apply to Sumitomo Shoji America, the court relied first on the clear import of the treaty language. Article VIII(1) applies only to "companies of either Party" doing business "within the territories of the other Party." A definitional provision of the treaty, article XXII(3), states that a corporation has the nationality of its place of incorporation: "the term 'companies' means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit. Companies constituted under the applicable laws and regulations within the territories of either Party *shall be deemed companies thereof* . . . ." (4 U.S.T. 2063, 2078, italics added.) The court reasoned that, since Sumitomo Shoji America is " 'constituted under the applicable laws and regulations' " of New York, it is "a company of the United States, not a company of Japan. As a company of the United States operating in the United States, under the literal language of Article XXII(3) of the Treaty, Sumitomo cannot invoke the rights provided in Article VIII(1), which are available only to companies of Japan operating in the United States and to companies of the United States operating in Japan." (*Sumitomo, supra,* 457 U.S. at pp. 182-183 [72 L.Ed.2d at pp. 771-772], fn. omitted.)

The court found that this literal reading of the treaty is consistent with the actual intent of the signatories. The purpose of the treaties was to assure companies the right "to conduct business on an equal basis" with companies of the host countries. "The Treaties accomplished their purpose by granting foreign corporations 'national treatment' in most respects [i.e., the treatment accorded to nationals of the host country] and by allowing foreign individuals and companies to form locally incorporated subsidiaries. These local

subsidiaries are considered for purposes of the Treaty to be companies of the country in which they are incorporated; they are entitled to the rights, and subject to the responsibilities of other domestic corporations. By treating these subsidiaries as domestic companies, the purpose of the Treaty provisions—to assure that corporations of one Treaty party have the right to conduct business within the territory of the other party without suffering discrimination as an alien entity—is fully met." (457 U.S. at p. 188 [72 L.Ed.2d at pp. 774-775], fn. omitted.)

The court did not see any anomalous consequences in reserving a right to branches of Japanese companies which was not enjoyed by American subsidiaries of the companies. "[T]he subsidiaries, as companies of the United States, would enjoy all of those rights [of the branches] and more. The only significant advantage branches may have over subsidiaries is that conferred by Article VIII(1)." (457 U.S. at p. 189 [74 L.Ed.2d at p. 775].) In footnote 19, the court expressed no view as to whether an American subsidiary may assert any article VIII(1) rights of its foreign parent. (457 U.S. at pp. 189-190, fn. 19 [74 L.Ed.2d at pp. 775-776].)

The *Sumitomo* decision was consistent with the remarkably detailed and cogent textual analysis of the treaty found in the dissenting opinion of Justice Reavley in *Spiess v. C. Itoh & Co. (America), Inc.* (5th Cir. 1981) 643 F.2d 353 (hereafter *Spiess*), a case which was then before the Supreme Court on writ of certiorari. The Supreme Court evidently found the opinion persuasive since it vacated the *Spiess* judgment and remanded the case for further consideration in light of the *Sumitomo* decision. (*Spiess v. C. Itoh & Co.* (1982) 457 U.S. 1128 [73 L.Ed.2d 1344, 102 S.Ct. 2951].) Justice Reavley noted that the drafters of the Japanese FCN Treaty "consistently used three terms of art to allocate benefits among private parties, 'nationals of [Japan or the United States],' 'companies of [Japan or the United States],' and 'enterprises controlled by such nationals or companies.' The very creation of these three terms of art is a strong indication that the drafters viewed each as representing a distinct entity." (*Spiess, supra*, 643 F.2d at p. 365.) He found that, to avoid confusion and redundancy in other treaty provisions, these three terms of art must be read consistently as referring to separate entities. As applied to article VIII(1), this semantic usage dictated that the term of art "companies of [Japan or the United States]" should be read as having a distinct reference which did not include enterprises described by the third term of art—"enterprises controlled by such nationals or companies."

In Justice Reavley's view, this interpretation of article VIII(1) was reasonable in the context of the entire treaty. In general, the treaty assures

foreign corporations "national treatment" in the host country, i.e., a position of equality with enterprises in that country. Article VIII(1) was exceptional in that it conferred "a superior degree of rights upon companies of Japan and not upon their American subsidiaries . . . . It is very reasonable that the two nations would reserve the most extraordinary degree of Treaty protection only for business enterprises created under their own laws, and would allow enterprises created under the laws of the other party to be subject to those laws on a basis equal to all other companies of that party." (*Spiess, supra,* 643 F.2d at p. 369.)

Nikko S.F. nevertheless claims the right to assert the treaty rights of its Japanese parent, JALDC, under the authority of footnote 19 of the *Sumitomo* decision. It finds support in two recent federal decisions, *Fortino* v. *Quasar Co.* (7th Cir. 1991) 950 F.2d 389 and *Papaila* v. *Uniden America Corp.* (5th Cir. 1995) 51 F.3d 54. Both cases involved employment discrimination actions brought against the wholly owned American subsidiaries of Japanese companies. The *Fortino* court briefly addressed and distinguished the *Sumitomo* decision in a single paragraph, inserted in the middle of its analysis, holding that the domestic subsidiary could raise the treaty rights of its foreign parent. The court stated: "But can Quasar, not being a Japanese company in the technical sense in which this term is used in the treaty, rely on the treaty even to the limited extent suggested? *Sumitomo Shoji America, Inc.* v. *Avagliano* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), held that an American subsidiary of a foreign parent was not protected by the treaty. But there was no contention that the parent had dictated the subsidiary's discriminatory conduct, and the Court left open the question whether the subsidiary might in such a case assert any of its parent's treaty rights. [*Id.* at 189, n. 19, 102 S.Ct. at 2382, n. 19.] We think it must be allowed to in a case such as this, at least to the extent necessary to prevent the treaty from being set at naught. A judgment that forbids Quasar to give preferential treatment to the expatriate executives that its parent sends would have the same effect on the parent as it would have if it ran directly against the parent: it would prevent Matsushita from sending its own executives to manage Quasar in preference to employing American citizens in these posts. [Citation.]" (*Fortino* v. *Quasar Co., supra,* 950 F.2d at p. 393.) The *Papaila* court followed the *Fortino* decision without adding any new analysis.

The *Fortino* decision offers a slender factual basis for distinguishing the *Sumitomo* decision, i.e., there was no contention in *Sumitomo* that the parent had dictated the subsidiary's discriminatory conduct. We doubt that this distinction has much practical significance. The parent company will *always* have the power to control the management of its subsidiary and it will *always* be instrumental in obtaining E-1 or E-2 temporary visas for employees posted in the United States. (See 8 U.S.C. § 1101(a)(15)(E); 22 C.F.R.

former § 41.40 (1986).) It will be a rare case in which the subsidiary cannot produce evidence that its foreign parent "dictated" the employment decision question.

If this distinction has little practical significance, the *Fortino* decision has the effect of turning the *Sumitomo* decision on its head by reducing the holding to a matter of procedural form. Instead of claiming for itself rights under the treaty, the domestic subsidiary will assert the treaty rights of its parent. Such an interpretation of *Sumitomo* is inconsistent with the Supreme Court's own understanding of the effect of its decision. Plainly regarding the distinction between branches and subsidiaries as a matter of substance rather than form, the opinion describes the rights conferred by article VIII(1) as a "significant advantage branches may have over subsidiaries." (*Sumitomo, supra*, 457 U.S. at p. 189 [72 L.Ed.2d at p. 775].)

Seeking refuge in an unassailable principle, the *Fortino* court states that the subsidiary must be allowed to raise the parent's treaty rights "to prevent the treaty from being set at naught." (*Fortino* v. *Quasar Co., supra*, 950 F.2d at p. 393.) The statement, however, lacks any actual application to the text of the treaty or to its underlying purpose. The exhaustive and meticulous textual analysis of Justice Reavley in *Spiess* reveals that the drafters of the treaty were at pains to make a distinction between branches of foreign companies operating in a host country and the locally incorporated subsidiaries which they controlled. By blurring, if not obliterating, this distinction, the *Fortino* decision has the effect of *altering* the carefully drafted terms of the treaty.

Moreover, the court's statement of principle ignores the actual purpose of the Japanese FCN treaty as authoritatively construed in the *Sumitomo* decision. As viewed by the Supreme Court, the purpose of the treaty was to allow foreign companies to conduct business overseas on a position of equality with domestic companies in the host country. The purpose was achieved, in part, by allowing the foreign companies to form locally incorporated subsidiaries. It is entirely consistent with this purpose to treat these subsidiaries as being subject to the same regulatory laws as domestic companies with which they compete.

Lastly, the *Fortino* court suggests that a restriction against discriminatory hiring practices of a domestic subsidiary "would have the same effect on the parent as it would have if it ran directly against the parent." (*Fortino* v. *Quasar Co., supra*, 950 F.2d at p. 393.) The parent, however, may avoid this restriction by doing business through a branch operation entitled to treaty rights under article VIII(1); it will incur the restriction only if it chooses to

do business as an American corporation through a wholly owned subsidiary. The parent is not set at a disadvantage by a restriction which results from a deliberate business decision with many attendant advantages.[2]

While we find the analysis of the *Fortino* decision to be unpersuasive and its holding too broad, the issue reserved by footnote 19 of the *Sumitomo* decision continues to pose serious and unresolved questions. There are, of course, certain well-established grounds in many areas of law for piercing the corporate veil of a corporate subsidiary or for raising the rights of a closely related third party. (See, e.g., *Edmonson* v. *Leesville Concrete Co.* (1991) 500 U.S. 614, 628-629 [114 L.Ed.2d 660, 678-679, 111 S.Ct. 2077] [standing to raise impairment of constitutional rights of third party].) By drawing on such analogous bodies of law, a domestic subsidiary of a Japanese company may well be able to fashion, under appropriate circumstances, a valid basis for asserting standing to raise the parent's treaty rights, at least with respect to certain employees.[3]

In its motion for summary judgment, however, Nikko S.F. did not articulate any theory of standing to raise the treaty rights of JALDC under principles drawn from a related field of law but rather asserted a broad right to raise the parent's treaty right under the *Fortino* decision. We find its reliance on *Fortino* to be unpersuasive. Moreover, the record indicates that the decision to terminate Kirmse was made in the United States by persons acting in their capacity as executives of domestic corporations. Akira Osawa, the president of Nikko S.F., arrived at the decision to terminate Kirmse and personally informed him of the decision after consulting with a personnel relations consultant, a corporate attorney, and David Lloyd, an executive of a JALDC domestic subsidiary, at a series of meetings at the San Francisco International Airport. According to Osawa, Kirmse was terminated by Nikko S.F.

Since we reject *Fortino* and find nothing in the record providing an alternative basis for Nikko S.F. to claim its parent's treaty rights, we conclude that the trial court erred in ruling that the plaintiff's employment discrimination claims in his second and third causes of action were barred by article VIII(1) of the Japanese FCN Treaty. Our holding, however, does not necessarily call for reversal of the summary adjudication of these causes of

---

[2]For a critique of the *Fortino* decision, see Moses, *Favoring Foreign Citizens in the U.S. Workplace* (Mar. 2, 1992) N.J. L.J. 6.

[3]We note that the standing of Nikko S.F. to raise article VIII(1) rights of JALDC would present distinct issues with respect to Moroi and Fujita. The former was assigned by the parent company to control and manage its $200 million investment in hotel real estate (see Japanese FCN Treaty article VII(1)); the latter was assigned to assist in a marketing strategy of attracting the patronage of Asian businesspersons.

action. With respect to the second cause of action for violation of the FEHA, Nikko S.F. argues that the trial court's mistaken reason for granting summary adjudication represents harmless error since it was entitled to summary adjudication on another ground advanced in the motion—Kirmse failed to raise a triable issue of discrimination under the act. (*Sacks* v. *FSR Brokerage, Inc.* (1992) 7 Cal.App.4th 950, 960-961 [9 Cal.Rptr.2d 306].) The third cause of action for termination in violation of public policy also leaves additional issues.

## II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Costs are awarded to Nikko S.F. and JALDC in appeal No. A070572.

Costs are awarded to Kirmse in appeal No. A071366.

Strankman, P. J., and Dossee, J., concurred.

A petition for a rehearing was denied December 20, 1996.

*See footnote, *ante,* page 311.