[No. G035681. Fourth Dist., Div. Three. June 1, 2007.]

JAMES HALUCK et al., Plaintiffs and Appellants, v.
RICOH ELECTRONICS, INC., et al., Defendants and Appellants.

## Counsel

Law Offices of Michelle A. Reinglass, Michelle A. Reinglass; Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Plaintiffs and Appellants.

Callahan & Blaine and Jim P. Mahacek for Defendants and Appellants.

## Opinion

**RYLAARSDAM, J.**—Plaintiffs James Haluck and Michael Litton appeal from a judgment in favor of defendants Ricoh Electronics, Inc., Larry Vaughn, Haruo Uesaka, Yoji Ide, Yoshihiro Nomura, and Houssam El Jurdi on their complaint for employment discrimination on the ground the trial judge's misconduct so infected the proceedings they were deprived of a fair trial. Defendants filed a protective cross-appeal, claiming the trial court erred by denying their motions for summary judgment and summary adjudication on the ground the action was barred by a United States treaty with Japan. Defendants also filed a motion for sanctions against plaintiffs and their counsel, claiming the appeal is frivolous.

We conclude the trial judge's conduct was sufficiently egregious and pervasive that a reasonable person could doubt whether the trial was fair and impartial and reverse on that ground. On remand, the case shall be assigned to a different judge. Because we reverse, the motion for sanctions is denied.

As to defendants' cross-appeal, the court properly found the treaty did not bar the action and thus we affirm its ruling.

## FACTS

Based on the nature of this appeal, few of the underlying facts are relevant. Plaintiffs were employed by defendant Ricoh. They sued Ricoh and certain of its employees for damages for statutory and common law discriminatory employment practices, claiming they were passed over for promotions, and Litton ultimately wrongfully terminated, because they were Caucasian and complained about racial discrimination. After a 30-day-plus trial, the jury returned a defense verdict.

## THE MISCONDUCT

We recite only the most egregious instances of the judicial misconduct cited by plaintiffs.

Ricoh sought to introduce a video it used for training or public relations purposes. (Characterization by the trial court.) Plaintiffs' lawyer contended, among other reasons for excluding it, that the video was "prejudicial . . . and it's a marketing piece and has no bearing on the lawsuit." The court announced it would watch the video during the lunch hour and did so together with defense counsel without notifying plaintiffs' lawyer that he would be present or inviting her to join them. It then overruled plaintiffs' objections to admission of the video.

Somewhere midpoint in trial, in overruling one of plaintiffs' objections, the judge held up a hand-lettered sign, apparently prepared by him, stating "overruled." The next day, when the court overruled another of plaintiffs' objections, defendants' attorney presented the judge with a different sign, stating: "Your honor, I want to help you if I may. This is a much nicer version. [¶] The Court: Better than my homemade one. [¶] Ms. Reinglass: Plaintiffs object to Mr. Callahan presenting another 'overruled' sign to the court. The court's sign was adequate enough. [¶] The Court: The court will await receiving a 'sustained' sign from plaintiff[s] so we can split the benefits here. [¶] Ms. Reinglass: How many do I get?"

A week later, when plaintiffs' lawyer objected to a question, the court apparently used Mr. Callahan's "overruled" sign. "Ms. Reinglass: [I am objecting to a]ny reading of the document not in evidence. [¶] The Court: He's not reading, [he's] asking questions. [¶] Ms. Reinglass: Hopefully he

won't read. [¶] The Court: And hopefully he won't keep talking. [¶] Mr. Callahan: Your honor, I didn't get a chance to make that. [¶] The Court: It took too much time to make that sign. [¶] Ms. Reinglass: And there's a sign, and I object to that. [¶] The Court: He is directing it to me. It's lightening things up. And the jury nods."

Midway into the trial, the court stated, "Jeffrey [the clerk], we're going to the soccer style method here. Red card, 50 bucks each. Okay. If I say, red card plaintiff, write it down, 50 bucks. Red card defense, 50 bucks. [¶] We'll keep a running tab. End of trial, we'll collect it from them and we may take you guys [presumably the jury] to lunch at a very nice place. Okay. Court has enough money for now, and that will either *stop the talking* or give you a very nice lunch." (Italics added.)

Over the next 20 pages of transcript, during which plaintiff Litton was being examined, defendants' lawyer raised at least nine objections, six of which were overruled, with no mention of a red card. Then, when plaintiffs' counsel stated she was reading the last portion of a deposition, defendants' counsel stated, "Very good. [¶] . . . [¶] I probably shouldn't say very good. No objection." The court states, "That's an orange card, not a red card."

During the next 12 pages or so in the transcript, defendants' lawyer made three objections, two of which were overruled. As plaintiffs' lawyer continued her examination of Litton, she noted she was almost finished with a section. Defendants' counsel stated "352." The court responded, "351 and a half. [¶] Go ahead." After several questions, defendants' lawyer stated, "351 and three-quarters," to which the court replied, "Overruled. Numbers junky." No red cards were mentioned.

Over the next 10 pages of transcript, defendants' lawyer raised two more objections, one of which was overruled. Defendants then interposed a hearsay objection. The court asked, "We're going to have [the expert witness] testify, right? [¶] Ms. Reinglass: Pardon me? [¶] The Court: We're going to have him testifying, right? [¶] Ms. Reinglass: Yes. [¶] The Court: And [Litton] is testifying to his numbers pretrial and questioned on the complaint and not about experts and discovery, so we'll wait for the expert to tell us what those numbers were and how had he arrived on them. [¶] Sustained. [¶] Ms. Reinglass: May I? [¶] The Court: Red card plaintiff, Jeffrey. [¶] Ms. Reinglass: I was asking. [¶] The Court: 5-0. Next question."

In testifying as to his emotional distress, Litton stated that he felt like he was in a white room without doors or windows that had no boundaries. On cross-examination as to this testimony, the following exchange occurred:

"Mr. Callahan: Q Have you ever heard of The Twilight Zone? [¶] A Yes sir. [¶] Q Goes kind of like this, do do, do do. [¶] Ms. Reinglass: Your Honor, I would just object. This is argument. [¶] The Court: Your objection's on the record, ma'am. [¶] Ms. Reinglass: Also improper argument. [¶] Mr. Callahan: You're traveling through another dimension, a dimension not only of sight and sound, but of mind, a journey into a wondrous land, whose boundaries are that of imagination[;] that's a sign post up ahead, your next stop, The Twilight Zone. Do do, do do. Do do, do do. [¶] The Court: That was terrible. Get to the question, please. [¶] Ms. Reinglass: Noting for the record, counsel was singing The Twilight Zone theme song. [¶] The Court: And how the jurors left it will be reflected on the same record. [¶] By Mr. Callahan: Q Endless white room with no doors or windows. [¶] Is that where you got your idea of this white room theory? [¶] . . . [¶] A From where? [¶] . . . [¶] The Court: Twilight Zone. That's his question. [¶] The Witness: No sir. [¶] Mr. Callahan: Do do, do, do. Do do, do do. [¶] Ms. Reinglass: I request that counsel stop singing. As entertaining as it is for the jury, it's mocking my client and mocking the trial. [¶] By Mr. Callahan: Q Ever heard of The Twilight Zone, the show? [¶] A Yes sir. [¶] The Court: For the record, he hit a few notes of The Twilight Zone theme song which I don't see as mocking. He was off color [sic]. [¶] Mr. Callahan: I go through life tone deaf and colorblind. This is tough."

During defense counsel's cross-examination of Litton, he read approximately 30 pages of the deposition of Rhonda Stevenson, a one-time employee of Ricoh. Stevenson was not a defendant and at the time of her deposition no longer worked for Ricoh. She never testified at trial. Litton had complained to her about what he believed was unfair treatment. Litton was asked whether he had read her deposition and then counsel was allowed to read several portions of her testimony and ask Litton if he recalled reading that testimony. For example, "Did you read . . . where [Stevenson] said you were insincere and tried to manipulate both her and [another employee]?" "Do you recall [Stevenson's] testimony that you were a proper candidate for layoff . . . ?" When Litton said he did not recall, the court permitted defendants' lawyer to read Stevenson's testimony to that effect.

During that testimony, plaintiffs' lawyer raised numerous objections. At one point she asked to "have a running objection until I add anything new. [¶] The Court: That would help. Same objection that's been going on all day will

be deemed to be made to every question and every answer throughout time. [¶] Ms. Reinglass: There may be some I like. [¶] The Court: With the same ruling. Well, until I die. Same ruling. Okay. [¶] Ms. Reinglass: Just as to Ms. Stevenson's deposition. I'll settle for that for now."

As defendants' counsel continued to cross-examine Litton using that deposition, before one question he stated, "Okay. This one is not good ·for Mr. Haluck . . . . [¶] Ms. Reinglass: Objection to the characterization by counsel. Improper argument. [¶] The Court: It's a warning. Just giving the witness a heads up. [¶] What's the question, sir?".

The next day, as defendants' lawyer again began to cross-examine Litton using the deposition, plaintiffs' lawyer objected, to which the court responded: "Overruled. Objection, 187. [¶] Ms. Reinglass: Huh? [¶] The Court: I got a number for all these things. [¶] Mr. Callahan: 187 in the Penal Code, what is that, your honor? [¶] The Court: Murder."

In another instance, when Litton was testifying that he was discriminated against because of his race, his lawyer asked: "And did you feel that it was based upon your race because of comments by [defendant] Nomura?" The court sustained an objection as leading. Counsel then rephrased, asking, "Was there any other reason why you felt that it was based upon your race? [¶] A [D]ue to the comment by [defendant] Nomura." Defendants' attorney stated, "What a surprise," to which the judge remarked, "Aren't they clever. [¶] (Laughter)."

As defendants' counsel was concluding his cross-examination of Litton, the following exchange occurred: "With that, your honor—[¶] Oh, do you [Litton] play poker? [¶] A No, sir. [¶] Q Terrific poker face." Plaintiffs' lawyer objected "to the editorializing by counsel." There was no ruling.

After a question by plaintiffs' counsel, defendants' attorney stated, "Objection. Gosh, what is that? [¶] The Court: What is it? [¶] Mr. Callahan: Hearsay. [¶] The Court: Overruled. [¶] Mr. Callahan: How about—[¶] The Court: No. Go back to sleep. [¶] . . . [¶] Mr. Callahan: Wake me when it's break time. [¶] The Court: It's very close. [¶] (Laughter)." Later that day, when Mr. Callahan made an objection, the court stated, "Don't wake him up," to which Mr. Callahan replied, "Hey, I don't get a lot of sleep."

## DISCUSSION

*Plaintiffs' Appeal*

1. *Introduction*

█ Plaintiffs assert the judgment should be reversed because the judge committed misconduct so egregious they were denied a fair trial. We agree.

█ In conducting trials, judges " 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.' [Citation.]" (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237–1238 [39 Cal.Rptr.3d 799, 129 P.3d 10].) Their conduct must " ' " 'accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality.' " ' " (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 462 [134 Cal.Rptr.2d 756].) " 'The trial of a case should not only be fair in fact, . . . it should also appear to be fair.' " (*Id.* at p. 455.) The judge's actions and comments during trial violated these principles such that " 'it shocks the judicial instinct to allow the judgment to stand.' [Citation.]" (*Ibid.*)

2. *Ex Parte Contact*

Plaintiffs challenge the judge's viewing of the videotape with defendants' counsel present, claiming it was improper ex parte contact that "tainted" the court's ruling on its admissibility.

█ Generally ex parte contacts between a judge and counsel are improper, and if not unjust in actuality, give the appearance of injustice. (See *In re Hancock* (1977) 67 Cal.App.3d 943, 947–949 [136 Cal.Rptr. 901].) "A judge shall not initiate, permit, or consider ex parte communications . . . concerning a pending . . . proceeding, except" "where circumstances require, for . . . administrative purposes . . . that do not deal with substantive matters provided: [¶] . . . the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and [¶] . . . the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond." (Cal. Code Jud. Ethics, canon 3B(7)(d); see also Rules Prof. Conduct, rule 5-300(B) [lawyer shall not communicate with judge about merits of pending contested case except in open court, in writing, or in presence or with consent of opposing counsel].)

The record shows defendants' lawyer was present when the court previewed the video. Although it also reflects that the judge stated he would

review the video at lunch, there was never any indication he would do so with defendants' counsel present or that plaintiffs' lawyer was invited to participate.

And the contact between defense counsel and the court dealt with a substantive matter—whether or not the videotape, to which plaintiffs objected, would be admitted. As plaintiffs note, we have no way of knowing whether there was discussion during which defendants' counsel explained the video, to which plaintiffs' lawyer would be entitled to respond.

We are not holding that either the judge or defendants' counsel intended to violate any professional standards in this instance. However, the trial judge should not have permitted counsel for only one party to participate in viewing the video with him.

### 3. *Lack of Courtesy and Decorum*

■ The remainder of the court's conduct set out above was also improper. Judicial ethics require a judge to "be patient, dignified, and courteous to litigants . . . [and] . . . lawyers . . . and . . . require similar conduct of lawyers . . . under the judge's direction and control." (Cal. Code Jud. Ethics, canon 3B(4).) The delineated exchanges between the court and counsel are the antithesis of judicial decorum and courtesy. They cannot in any sense be characterized as "tempered miscellaneous comments," as defendants suggest. (Boldface, capitalization, and underscoring omitted.)

#### a. Twilight Zone

We are not persuaded by defendants' assertion that many of the exchanges between the judge and defendants' lawyer, such as the *Twilight Zone* colloquy, cannot be judicial misconduct because they were made by counsel, not the judge. That misses the point. Although some of these comments were counsel's, the judge instigated and encouraged many of them. He also allowed, indeed helped create, a circus atmosphere, giving defendants' lawyer free rein to deride and make snide remarks at will and at the expense of plaintiffs and their lawyer. That was misconduct. (Cal. Code Jud. Ethics, canon 3B(3) ["A judge shall require order and decorum in proceedings"].)

#### b. *"Overruled" Signs*

The "overruled" signs also demonstrated the court's lack of courtesy and decorum. Defendants' arguments justifying this conduct are imaginative but fatuous. We reject their characterization of use of the sign as the court

"overruling certain objections in writing." (Boldface, underscoring, and capitalization omitted.) The judge's suggestion to plaintiffs' lawyer that she supply a "sustained" sign was not "circumspect" nor is counsel to be faulted for not "choosing" to provide one. This conduct was a sideshow in the overall circus atmosphere mocking a serious proceeding important to the parties, and it "cast the judicial system itself in a bad light in the eyes of the litigants and the public at large." (*Hernandez v. Paicius, supra,* 109 Cal.App.4th at p. 455.)

Defendants challenge plaintiffs' argument that the court used these signs only when ruling on their objections. Again, this misses the mark. It is like saying a baseball team could not complain if the umpire decided to call balls and strikes with his eyes closed, as long as he kept them closed for both teams. The point is not that the acts were evenhanded, it is that the game could not safely be said to have been played according to the rules. And if defendants' lawyer was enjoying the spectacle, he would not object to use of the signs to overrule his objections.

Plaintiffs argue the court's use of the sign was persistent. The record does not specifically reflect it. But the fact that the sign was still in use a week after first being displayed lends support to this assertion. We agree this conduct made a mockery of plaintiffs' objections.

Defendants' argument plaintiffs waived their challenge to this behavior by failing to object to the judge's initial use of the sign he made, by commenting it was adequate, or by failing to ask for a curative instruction does not persuade. Counsel did note the judge's sign for the record; that certainly was not to approve of it. She also objected to use of defendants' sign, twice, and the court denied the objections. A request for a curative instruction would have been futile. (*People v. Sturm, supra,* 37 Cal.4th at p. 1237.)

### 4. *Stevenson Deposition*

#### a. *Improper Use of Deposition*

There was also misconduct connected to the reading of the Stevenson deposition. Plaintiffs argue actual use of the deposition testimony was improper for several reasons, including that it contained improper opinion and hearsay, and lacked foundation, and based on the failure to comply with Evidence Code section 1291, subdivision (a)(2). In addition to the erroneous ruling on admissions, plaintiffs protest the demeaning manner in which the court overruled their objections. Plaintiffs are correct on both counts.

■ Under Evidence Code section 1291, subdivision (a)(2), subject to certain conditions not at issue here, previously recorded testimony may be

offered at trial only if the deponent is unavailable as a witness. Code of Civil Procedure section 2025.620, subdivision (b) is an exception to this rule in that it allows the deposition of a party or one who was an employee of a party at the time the deposition is taken to be used at trial against the other party, whether or not the deponent is available. Here, however, Stevenson was not employed by Ricoh at the time her deposition was taken. Thus the conditions of section 2025.620, subdivision (b) were not met, and the record does not reflect any showing of Stevenson's unavailability. (Evid. Code, § 1291, subd. (a)(2); see also Code Civ. Proc., § 2025.620, subd. (c).) Thus, it was error to admit the testimony, and plaintiffs sufficiently objected to its admission.

   b.   *"Until I Die" and "187" ("Murder")*

When plaintiffs' lawyer asked for a running objection to use of the Stevenson deposition, the court agreed the objection would apply to every question "until I die." Later, when counsel raised another objection, the judge overruled it, noting, "Objection, 187." In response to defendants' lawyer's facetious question about Penal Code section 187, the court stated, "Murder."

It is unclear from the record exactly what the court meant when it used "187" in overruling plaintiffs' repeated objections. It could have been a sarcastic reference to the number of objections plaintiffs had made, as they contend. The "until I die" statement makes it clear the court had no use for the objections. If the colloquy had stopped at the court stating "187," it probably would not have been a factor in this case. But the judge again allowed defendants' counsel to make an inappropriate remark and joined in the continuing antics by responding to the Penal Code question with the answer, "murder."

The court and defendants' lawyer may just have been having a good time; defendants comment in their brief that the Penal Code reference was "[o]bviously . . . a humorous question." But while humor may have a legitimate place in a trial, it should not be used to belittle litigants or their counsel. Here the judge and defendants' lawyer had fun by making plaintiffs' lawyer the butt of their jokes. They took turns providing straight lines and punch lines to each other in a way that could only convey to the jury that they were a team and plaintiffs' counsel was an outsider.

5.   *Soccer Game*

Use of the "soccer-style" "red card" procedure was glaringly inappropriate, also violating the requirement of judicial decorum. In addition, in employing it the court demonstrated favoritism toward defendants. After it was initiated,

defendants' attorney was allowed to raise numerous objections, some of which were overruled, and to joke with the judge without being fined. When plaintiffs' lawyer attempted to address an objection, however, she was immediately given a "red card." In instituting this game, the judge stated he wanted to "stop the talking." However, apparently he only wanted to stop plaintiffs' lawyer from talking. This unequal treatment improperly "created the impression that the trial judge was allied with [defendants]." (*People v. Sturm, supra,* 37 Cal.4th at p. 1241.)

We reject defendants' argument based on their self-described scorecard showing they received 12 red cards compared to plaintiffs' three, and concluding the "match favors [plaintiffs.]" (Boldface, underscoring, and capitalization omitted.) The problem with this claim is the same as with the court's conduct. A trial is not a sporting event. Defendants' spin on this conduct is ludicrous; it was not a "circumspect" way to " 'tone down' " imposition of sanctions. There was nothing circumspect about it; it was designed to make the sanctions as obvious as possible to the jury.

### 6. "Aren't They Clever"

The "aren't they clever" comment disparaged Litton's testimony and implied he was not telling the truth and that his lawyer was trying to sneak in otherwise inadmissible evidence. (*People v. Sturm, supra,* 37 Cal.4th at p. 1240.) "[A] trial court must avoid comments that convey to the jury the message that the judge does not believe the testimony of the witness. [Citations.]" (*Id.* at p. 1238.) In addition, " '[i]t is completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial.' . . . The trial court's comment implying that . . . counsel was behaving unethically or in an underhanded fashion constituted misconduct." (*Id.* at pp. 1240–1241.)

The fact that the judge used the word "clever" at many times throughout the trial and in different contexts not all unfavorable to plaintiffs, as defendants point out, does not undo the damage inflicted by the instance of misconduct. Here there was no question the word "clever" was a derogatory reference to plaintiff Litton's testimony. That the word was used neutrally in other contexts is wholly irrelevant. "[I]t is 'the duty of the judge to *control* all proceedings during the trial, and to *limit* the introduction of evidence and the *argument* of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' " (*People v. Sturm, supra,* 37 Cal.4th at p. 1237, italics added.) Obviously, that was not done here.

The other comments by defendants' counsel that the court allowed over plaintiffs' objections, including reference to Litton's "poker face" and that a question was "not a good one" for Haluck, are more examples of the inappropriate conduct that mocked plaintiffs and their testimony and impugned their credibility.

## 7. *Defendants' Assertions*

■ In addition to their other arguments discussed above, defendants maintain plaintiffs waived their claims of judicial misconduct because they did not object. We disagree. Although the general rule requires objection to preserve the right to appeal acts of judicial misconduct, "failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile. [Citations.]" (*People v. Sturm, supra,* 37 Cal.4th at p. 1237.) In the atmosphere of this trial, such was the case.

Defendants also point to curative instructions, which they claim mitigated any misconduct. After a lunch break one day the judge informed the jurors he would be instructing them later about how to apply law to the facts. He pointed out that he "talk[ed] a lot and you shouldn't take anything that I say seriously [because] I have no role in this trial. 'I have not intended by anything I have said or done or any question that I may have asked or by any rulings that I may have made to suggest how you should decide any question of fact or that I believe or disbelieve any witness. If anything I've done or said has seemed to so indicate, you must disregard it and form your own opinions.' " One of the standard jury instructions given at the end of trial repeated the language the jury should not decide based on the judge's statements or actions.

■ But neither instruction was directed to any particular misconduct, so the jury would have no way of knowing to what it referred. Further, in light of all the improper comments by the court and those it allowed from defendants' lawyer, the instructions constituted only a dribble of water incapable of quenching a blazing fire. "Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.]" (*People v. Sturm, supra,* 37 Cal.4th at p. 1233; see also *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207 [96 Cal.Rptr.2d 158] [admonitions throughout trial did not cure judge's statements giving impression he found defense case weak].) Having served in that capacity, we are well aware of the tremendous power the comments and attitude of a trial judge have on a jury. That power was repeatedly abused during this case and a passing admonition was not enough to cure it.

██ Defendants examine each act of misconduct individually and argue that a jury could not have perceived bias based on one comment during a 31-day trial. But it is the total effect of these acts and statements that is fatal. "Although no one instance of misconduct appears to, in itself, require reversal, the cumulative effect of the trial judge's conduct requires reversal." (*People v. Sturm, supra,* 37 Cal.4th at p. 1243.) Further, we reject defendants' argument that the misconduct on which plaintiffs rely cannot be characterized as pervasive because it only spanned day seven to day 22 of the trial.

In addition, defendants' 50-page-plus list of instances where they lost objections does not ameliorate the misconduct. Likewise, the fact the judge chastised their lawyer many times or was rude to him does not justify his other improper acts and comments. Moreover, to the extent this is true, neither side received a fair trial. That both parties were subjected to this conduct should not be a basis for affirming the judgment. Furthermore, as plaintiffs note, they bore the burden of proof. So the question is whether the court so interfered with their case it was impossible to meet that burden.

8. *Misconduct Requires Reversal*

"Where, as here, the appearance of judicial bias and unfairness colors the entire record, we depart from the general rule requiring plaintiff to make an affirmative showing of prejudice. The test is not whether plaintiff has proved harm, but whether the court's comments would cause a reasonable person to doubt the impartiality of the judge or would cause us to lack confidence in the fairness of the proceedings such as would necessitate reversal. The record here inspires no confidence in either case." (*Hernandez v. Paicius, supra,* 109 Cal.App.4th at p. 461.)

"We scrupulously guard against bias and prejudice, actual or reasonably perceived, not only to prevent improper factors from influencing the fact finder's deliberations, but to vindicate the reputation of the court itself. . . . 'We must also keep in mind . . . that the source of judicial authority lies ultimately in the faith of the people that a fair hearing may be had.' " (*Hernandez v. Paicius, supra,* 109 Cal.App.4th at p. 462; see Cal. Code Jud. Ethics, canon 2A ["A judge . . . shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"].)

It is obvious that much of the judge's conduct was not malicious but rather a misguided attempt to be humorous, and defendants' lawyer played into it, often acting as the straight man. But a courtroom is not the Improv and the presider's role model is not Judge Judy. We can only imagine what was in the jurors' minds as they endured a 30-day-plus trial in this atmosphere or the impression of the judicial system they took away with them posttrial.

"Where the average person could well entertain doubt whether the trial judge was impartial, appellate courts are not required to speculate whether the bias was actual or merely apparent, or whether the result would have been the same if the evidence had been impartially considered and the matter dispassionately decided [citation], but should reverse the judgment and remand the matter to a different judge for a new trial on all issues." (*Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 247 [42 Cal.Rptr.2d 440].) We do that here.

*Defendants' Appeal*

Defendants filed a protective cross-appeal from the court's denial of their motions for summary judgment and motions for summary adjudication of issues on the ground that the action was barred by the Japanese Friendship, Commerce and Navigation Treaty of 1953 (Apr. 2, 1953, 4 U.S.T. 2063, T.I.A.S. No. 2863) (treaty), particularly article VIII(1). Article VIII(1) provides that "companies of either Party [to the treaty] shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice." (4 U.S.T. 2063, 2070.) Article VIII(1) is "intended to give both parties to the treaty a degree of discretion in staffing enterprises operating in the other's country with managerial or technical personnel from the home country. [Citation.]" (*Kirmse v. Hotel Nikko* (1996) 51 Cal.App.4th 311, 317 [59 Cal.Rptr.2d 96].)

Defendant Ricoh, a United States company, is a wholly owned subsidiary of Ricoh Corporation, a New Jersey corporation, which is a wholly owned subsidiary of Ricoh Company, Ltd., a Japanese corporation (Ricoh Japan). Defendants assert that any claim of discrimination against plaintiffs on the basis of their race or national origin was only Ricoh Japan placing its employees at defendant Ricoh "on a temporary basis in key management and technical positions . . . as permitted by the [t]reaty." Since the treaty allows such temporary employees, they continue, it bars plaintiffs' suit.

The one California case on this subject, *Kirmse v. Hotel Nikko, supra,* 51 Cal.App.4th 311, rejects defendants' claim, holding that the treaty "does not apply to a domestically incorporated subsidiary of a Japanese corporation." (*Id.* at p. 317.) In arriving at this decision, *Kirmse* relied on *Sumitomo Shoji America, Inc. v. Avagliano* (1982) 457 U.S. 176 [72 L.Ed.2d 765, 102 S.Ct. 2374]. It contained a detailed analysis of the treaty and its underlying intent and went to great lengths to distinguish between United States branches of a Japanese corporation, which would be subject to the terms of the treaty, and locally incorporated subsidiaries, which would not. *Sumitomo* reasoned that because Sumitomo Shoji America was incorporated in New York, it was "a company of the United States, not a company of

Japan. As a company of the United States operating in the United States, under the literal language of . . . the [t]reaty, Sumitomo cannot invoke the rights provided in Article VIII(1), which are available only to companies of Japan operating in the United States and to companies of the United States operating in Japan." (*Sumitomo Shoji America, Inc. v. Avagliano, supra,* 457 U.S. at pp. 182–183, fn. omitted.)

Defendants primarily rely on a footnote in *Sumitomo* in which the court noted that it expressed no view on whether a United States subsidiary of a Japanese corporation could assert its parent's rights under the treaty. (*Sumitomo Shoji America, Inc. v. Avagliano, supra,* 457 U.S. at pp. 189–190, fn. 19.) They claim defendant Ricoh may assert such rights. *Kirmse* considered that issue, noting that in some circumstances, namely piercing the corporate veil or where there was a closely related third party, a subsidiary could have standing to assert rights under the treaty. (*Kirmse v. Hotel Nikko, supra,* 51 Cal.App.4th at p. 321.)

Here, there is no claim of piercing the corporate veil. Defendants advance the theory that Ricoh Japan is a closely related third party. They point to *Edmonson v. Leesville Concrete Co.* (1991) 500 U.S. 614 [114 L.Ed.2d 660, 111 S.Ct. 2077], which stated that in " 'certain, limited exceptions,' . . . a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he or she has suffered a concrete, redressable injury, that he or she has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests." (*Id.* at p. 629.)

Defendants fail to meet this burden. They argue Ricoh Japan has suffered injury but do not address whether defendant Ricoh, "the litigant," has been harmed. Moreover Ricoh is not even a direct subsidiary of Ricoh Japan; it is owned by Ricoh Corporation, a New Jersey corporation, which is the subsidiary of Ricoh Japan. Defendants have not shown *Edmonson* or any other authority would allow standing in such an attenuated circumstance.

Defendants also rely on *Fortino v. Quasar Co.* (7th Cir. 1991) 950 F.2d 389, which distinguished *Sumitomo* on the ground that in that case, there was no claim the subsidiary's discriminatory conduct had been mandated by the Japanese parent. In a well-reasoned discussion, *Kirmse* found *Fortino* unpersuasive and rejected it. (*Kirmse v. Hotel Nikko, supra,* 51 Cal.App.4th at pp. 319–321.) We agree with its conclusions and see no need to reiterate that discussion. Likewise, none of the other federal cases defendants cite dissuades us from our conclusion the treaty does not protect defendant Ricoh.

## DISPOSITION

The judgment is reversed. The motion for sanctions is denied. On remand the case shall be assigned to a different judge. Appellants Michael Litton and James Haluck are entitled to costs on appeal.

Sills, P. J., and Bedsworth, J., concurred.

On June 21, 2007, the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied August 29, 2007, S154322.